

*1189*

**Department of Correction**

3:21-CV-666 ⑤B

# MEMO





RECEIVED

JUL 17 2024

US DISTRICT COURT
MID DIST TENN

Inmate Name: _John Hall_     TDOC Number: _23854 /_

Institution: _NSL_     Housing Unit: _2A2c8_

Institution Grievance Number: _27-8148_     TOMIS Grievance Number: _367808_

Commissioner's Response and Reasons:

Upon reviewing your grievance and documentation, Policy 404.09, Protective Services, Section VI. (E)(2) states, "When extreme circumstance warrant the separation of an inmate from a staff member for significant and verifiable safety reasons (e.g., employee is the victim of an inmate assault resulting in serious injury) or serious conflict interest (e.g., staff member is closely related to the inmate or the inmate's victims of a violent or sexual offense), an incompatible may be filed. Such shall be affected subsequent to inquiry, written documentation, and Warden/s/Superintendent's approval." Staff-inmate incompatibles shall be filed only in extraordinary situations and shall not be placed solely at the request of an inmate our staff member.

☑ Concur with Warden     ☐ Concur with Supervisor     ☐ Appeal Denied

_OG- 11/26/24_
**Date**     _for L.A. Berry, Benjamin Ebbert_
**Assistant Commissioner of Prisons**

FS-1A





Department of Correction · 6th Floor Rachel Jackson Building · 320 Sixth Avenue North · Nashville, TN 37243 · Tel: 615-253-8180 · Fax: 615-253-1668 · tn.gov/Correction





Case 3:21-cv-00666     Document 77-3     Filed 07/17/24     Page 1 of 50 PageID #: 1278



 **Department of Correction**

# TENNESSEE DEPARTMENT OF CORRECTION
## INMATE GRIEVANCE RESPONSE

| Hall, John | 238941 | RMSI - 2A208 | 24-0148/00365819 |
|---|---|---|---|
| NAME | NUMBER | INSTITUTION & UNIT | GRIEVANCE NUMBER |

Summary and Testimony Presented to Committee    listed on the Hearing Minutes page, if applicable

Inmate Grievance Committee's Response and Reasons   No hearing was held. Grievance deemed inappropriate per TDOC Policy 501.01.

| May 24, 2024 | | |
|---|---|---|
| Date | CHAIRMAN | MEMBER |

| MEMBER | MEMBER | MEMBER |
|---|---|---|

Warden Response:    Agrees with Proposed Response   ☑

   Disagrees with Proposed Response

If Disagrees, Reasons for Disagreement  *Per Signature to CA Clarkson on Write-up was dismissed*

Action Taken:

DATE: 6-4-2024   WARDEN'S SIGNATURE: *Melissa Hood Coffee*

✱ write-up Dismissed (no-dispute). No longer inappropriate. 501.01 VI H   *I was punished 5 days*

Do you wish to appeal this response?   ___ YES   ✗ NO  *This is my remedy ... TCA 3-4/v.21-8/7.*

If yes:   Sign, date, and return to chairman for processing. Grievant may attach supplemental clarification of issues or rebuttal/reaction to previous responses if so desired. *Hannels v. Michigan 501 U.S. 957, 973-96 (1) I was illegally Rewisked by TDOC Staff for 60 days and a false charge Powlix D-Baord Action outside scope of Govt. Authority and Denied a Grievance Hearing to determine Merits of Court TCA § 4-5-313.*   *June 5, 2024*   *J. Hall*

*601 W. 143 GRIEVANT Woods 2007 WL 173704 ✱3*   DATE   (IF THE WARDEN, GRIEVANT)   WITNESS

**RECEIVED** JUN 11 2024

Commissioner's Response and Reason(s): _____

**RECEIVED JUN 07 2024 GRIEVANCE OFFICE RMSI**

BY: _____
   Prison Operations
   DATE

White-Inmate   Canary-Warden   Pink- Grievance Committee   Goldenrod-Commissioner

CR -1393 (Rev. 3-00)   *Compare: Gibbs 3:23-cv-01047 Doc 1-4, Filed 10/06/23 Page ID # 24*   RDA 2244



Imp-501.01 V1. (ADU)
# TENNESSEE DEPARTMENT OF CORRECTION

## INMATE GRIEVANCE


RECEIVED
MAY 07 2024
By Grievance

Jan Hall                 238941          U-Z-A-208 RMSI
**NAME**                 **NUMBER**       **INSTITUTION & UNIT**

DESCRIPTION OF PROBLEM: FAILURE TO TRAIN: On 04/27/24, I was wrongly charged with threatening an employee, policy #501-23.196 because CPL. Swaney arbitrary and discriminatory retaliated against me by denying me access to the law library at 12:30 call-out to cancel the violation.

REQUESTED SOLUTION: I want the warden to put an incompatible against Cpl. Swaney in accordance to TCA § 41-21-2015 because that officer is depraved in her thinking and fails to give male inmates the respect they deserve under this statute. See Unit 2 VPCS surveillance all day 4/27/24, Lock-down Eviction grievance from Appeal #39-16-510 April 28, 2024 Lock-Down

Jan Hall                    Denied Religious Service 7/28/24    April 28, 2024
Signature of Grievant                                        Date Consequence

§ 39-16-602 & 39-16-510

---

*TO BE COMPLETED BY GRIEVANCE CLERK*

24-0148/003.65.819       5/7/2024            Quin Tuam
**Grievance Number**     **Date Received**    **Signature Of Grievance Clerk**

---

INMATE GRIEVANCE COMMITTEE'S RESPONSE DUE DATE: _____

AUTHORIZED EXTENSION: _____
                          New Due Date                    Signature of Grievant

RECEIVED
MAY 24 2024
GRIEVANCE OFFICE
RMSI

**INMATE GRIEVANCE RESPONSE**

05/14/24  Summary of Supervisor's Response/Evidence: See CR-3148

05/14/24  Chairperson's Response and Reason(s): Supervisor Response Acknowledged

---

DATE: 05/13/24    CHAIRPERSON: _____

Do you wish to appeal this response?  __X__ YES _____ NO  See May 14, 2024 Rebuttal Statement of Jan Hall

If yes:  Sign, date, and return to chairman for processing within five (5) days of receipt of first-level response.

05/14/24  Jan D. Hall        May 14, 2024           SESW   5-14-24  05/24/24
          **GRIEVANT**         **DATE**                    **WITNESS**

---

Distribution Upon Final Resolution:

White – Inmate Grievant    Canary – Warden    Pink – Grievance Committee    Goldenrod – Commissioner (if applicable)

CR-1394 (Rev. 3-00)                     Page 1 of 2                                RDA 2244



# TENNESSEE DEPARTMENT OF CORRECTION
## RESPONSE OF SUPERVISOR OF GRIEVED EMPLOYEE OR DEPARTMENT

DATE: 5/7/2024

Please respond to the attached grievance, indicating any action taken.
Date Due: 5/18/2024

| 21-0140/001.2019 | Holly Tobio | 338014 |
|---|---|---|
| Grievance Number | Inmate Name | House |

- Deemed inappropriate per policy 501.01.

SIGNATURE

09 May 2024
DATE

White - Inmate Grievant    Canary - Warden    Pink - Grievance Committee    Goldenrod -- Commissioner

CR-3148 (Rev 2/21)

RDA 2244



State of Tennessee
Department of Corrections
Riverbend Maximum Security Institution
7475 Cockrill Bend Blvd.
Nashville, Tennessee 37243
(615) 350-3100 ext. 3718

**Rebuttal Statement**                    "Post-Deprivation Remedies"

FROM: Jon Hall #238941

DATE: May 14, 2024

**Rebuttal Statement:** This is No longer a Disciplinary Matter because Acting Warden Jason Chamberlain Dismissed this Incident Report # 01623196 on 05/08/2024. See That Links (LTBK) Disciplinary Sheet for Inmate # 238941 Jon Hall attached Hereto; which states.

"Dismissal for Acting Warden Chamberlain without any Formal Deprival Due Process." But in Expression at this Inmates Rights Thornhill v. Alabama 310 U.S. 88, 97 = 60 Sct 736, for otherwise the Works by failed to state a claim upon which Relief can be granted. TDOC Policy 502.05 "W" I-A.II A Page 15-19 ...

Now, this becomes a matter of T.C.A. § 37-16-870 Retaliation For asserting My Civil Rights under Title II 42 U.S. § 247 since I was in Kop Name and Denied My Court ordered Continued Progress in Hall v. Trump § 19 Count 25 Doc. # 6149 23-I Ex. A. Therefore it was Constitutionally protected Activity that Motivated the Retaliation. Thadeus X v. Blatter 175 F.3d 378, 387 (6th Cir. 1999). Now, I'm Seeking My Post-deprivation Remedies because CPL Sunday and Lt. Beaver created a false Report to deny My Rights, and I was punished 5 day Punitive Pending outcome of St. Major Said Time Served stated Matter 3 F.3d 1204, 1207 (5th Cir. 1993) (Damage $500 a day for solitary Confinement X Treble Damage, Totaling $ 25,000.) Abuse of Power Winston v. Coughlin 789 F. Supp 115-120-124 (WDNY 1992) (Fabricate Report to conceal XIII Amendment Solitary Confinement - Force)

## Disciplinary

 

Links:▼    Suspend ☐

TOKEN ID    [ 00238944 ]    Hall, John                    Status    ACTV    Location RMSI

Disciplinary        Sentence        Appeal

| | | | |
|---|---|---|---|
| Incident ID | 01623196 | Incident Date | 04/27/2024 |
| Site ID | RMSI    Riverbend Maximum Security Institution | | |
| Discip Date | 04/27/2024 | Discip Time | 04:16 PM |
| Class ID Number | | Section ID | |
| Position ID | | Disciplinary Class | |
| Refused to Sign Date | | Job Code | |
| Weapon Used | | Level of Violence | No Violence |
| Posted by Staff ID | BEAVSA04    Beaver, Samuel | | |
| Infraction Type | Threatening Employee | | |
| Offender Advisor | | | |
| Staff Advisor | | | |
| Offender Account | Dismissed Per Acting Warden Clendenin | | |
| | Outburst From Inmate Deemed Non-threatening But An | | |
| | Expression Of This Inmates Right | | |
| Decision ID | MOYERA01    Moyer, Raymond | | |
| | MOYERA01    Moyer, Raymond | | |
| | MOYERA01    Moyer, Raymond | | |
| Plea  N | Disposition    Dismissed | Disposition  Date | 05/06/2024 |

LIBK



**Department of**
**Correction**

**To:**   John Hall, #238941                    Unit/Location: 2A208

**From:**   Cpl. S. Ward, RMSI Grievance Chairperson

**Date:**   May 7, 2024

**Subject:**   **Inappropriate Grievance**

**This grievance is inappropriate to the grievance procedure.** Your grievance is being returned to you for one or more of the following reasons:

1. Disciplinary matters are inappropriate to the Grievance Procedure. [Policy #501.01 VI.(H)(1)]
2. Appealing decisions or actions of any agency outside the Tennessee Department of Correction (TDOC) is inappropriate to Grievance Procedure. [Policy #501.01 VI.(H)(2)]
3. Classification matters/institutional placement are inappropriate to Grievance Procedure. [Policy #501.01 VI.(H)(3)]
4. Appealing or seeking review of sentence credits. [Policy #501.01 VI.(H)(4)]
5. Grievance Procedure cannot award monetary compensation for injuries or property loss. [Policy #501.01 VI.(H)(5)]
6. Addressing questions regarding sentence structures. [Policy #501.01 VI.(H)(6)]
7. Visitor's behavior which results in disciplinary action. [Policy #501.01 VI.(H)(7)]
8. A diagnosis by medical professionals and medical co-pay is inappropriate. [Policy #501.01 VI.(H)(8)]
9. Security Threat Group (STG) Placement. [Policy #501.01 VI.(H)(9)]
10. Mail rejection. [Policy #501.01 VI.(H)(10)]
11. You have already filed a grievance on this issue. Inmates shall not be permitted to submit more than one grievance arising out of the same or similar incident. [Policy #501.01 VI.(I)(1)]
12. Abuse of Grievance Procedure. You can only have one grievance pending at Level 1 for review. [Policy #501.01 VI.(I)(2)]
13. Profanity, insults, and racial slurs, unless an alleged direct quote of another party, shall not be permitted. Threats may result in disciplinary action. [Policy #501.01 VI.(I)(3)]
14. Grievances must be filed within seven calendar days of the occurrence giving rise to the grievance. A complaint shall not address multiple issues. [Policy #501.01 VI.(C)(1)]

**This grievance is unable to be processed due to you not following policy.** Grievance forms not properly completed or containing insufficient information for processing shall be returned to the inmate with instructions as to proper completion. [Policy #501.01 VI.(C)(1)] Your grievance is being returned to you for the following reason(s):

1. No specific details (i.e. dates, times, names of persons involved as mandated in *Inmate Grievance Handbook*, Page 7, First Level of Review.)
2. You did not: a) Sign and date, and or b) state your "Requested Solution".
3. Grievance shall be submitted on Form CR-1394 pages 1 and 2. All copies must be legible and in tact. [Policy #501.01 VI.(C)(1)]
4. _____

**REMINDER:** You have seven (7) calendar days *FROM THE DATE THE INCIDENT OCCURRED* to submit a grievance. If you are still interested in filing this grievance, please make the necessary corrections and return to grievance office for further processing immediately. *If you would like to appeal this response, sign the bottom of your grievance, check "yes" then date it and place (with this coversheet) back in the grievance box.* If you have any questions regarding this memo, please have your Unit Officer contact me at Ext. #### to schedule an appointment. TDOC Policies and Procedures are available in the library.

Cpl. S. Ward, Grievance Chairperson, RMSI

Department of
Correction

MEMO

**To:** John Hall, #238941          Unit/Location: 2A208

**From:** Cpl. S. Ward, RMSI Grievance Chairperson

**Date:** May 7, 2024

**Subject:** **Inappropriate Grievance Notification**

**Grievance:** 24-0148/00365819

Your grievance has been deemed inappropriate to the grievance procedure.

1. Disciplinary matters are inappropriate to the grievance procedure.  (501.01 VI. H.1)
Appeals on disciplinary matters need to be done through the disciplinary process.

 Department of Correction

**MEMO**

**To:** Unit Manager Burnette

**From:** Cpl. S. Ward, RMSI Grievance Chairperson

**Date:** May 7, 2024

**Subject:** **Supervisor's Response Requested (CR-3148)**

**Grievance:** 24-0148/00365819

**Grievant:** John Hall, #238941                    Unit/Location: 2A208

The inmate listed above has filed a grievance pertaining to your department or area of responsibility. As a result, I need you to complete form CR-3148 with a Supervisor Response that specifically addresses the grievant's concern. You may complete the form electronically and e-mail it to me or complete the enclosed form and mail it back to the Grievance Office.

It is our goal to resolve all grievances at the lowest level possible. I ask that, if possible, please attempt to resolve the complaint with the grievant. If you get the issue resolved, please complete the following steps:

»» Complete the CR-3148, Supervisor Response form. Allow the grievant to review your response.

»» At the bottom of the Inmate Grievance Form (CR-1394), have the grievant check the NO box next to the ' Do you wish to appeal this response?' question.

»» Make sure the grievant signs and dates the CR-1394.

»» You sign the Witness line and return all paperwork to the Grievance Office.

If you are unable to resolve the issue, please complete the enclosed Supervisor's Response (CR-3148) as requested in the instructions at the opening of this memo and return it to the Grievance Office by the listed date.

Thank you for your help.

Department of Correction * Riverbend Maximum Security Institution * 7475 Cockrill Bend Blvd. * Nashville, TN 37243 * 615-350-3361 * tn.gov/Correction

Case 3:21-cv-00666    Document 77-3    Filed 07/17/24    Page 9 of 50 PageID #: 1286

 Department of
**Correction**

# MEMO

**To:** John Hall, #238941        Unit/Location: 2A208

**From:** Cpl. S. Ward, RMSI Grievance Chairperson

**Date:** May 13, 2024

**Subject:** **Supervisor's Response to Grievance**

**Grievance:** 24-0148/00365819

Enclosed you will find a copy of your grievance with the ORIGINAL FIRST PAGE of 'Inmate Grievance' form CR-1394. Please review this form which includes the supervisor's response and, if you would like to appeal, check (YES) or, if you don't want to appeal, check (NO). You must complete the CR-1394 by including your signature and date at the bottom where it indicates 'Grievant' and 'Date'.

Please note: if you fail to return the ORIGINAL CR-1394 signed, dated, and the (Yes) or (No) box checked, we will make a second attempt to contact you in regards to this grievance. If, after the second attempt, you still fail to respond, this grievance will be resolved due to failure of the grievant to participate in the grievance process.

Department of Correction * Riverbend Maximum Security Institution * 7475 Cockrill Bend Blvd. * Nashville, TN 37243 * 615-350-3361 * tn.gov/Correction

 Department of Correction

MEMO

**To:** John Hall, #238941                    Unit/Location: 2A208

**From:** Cpl. S. Ward, RMSI Grievance Chairperson

**Date:** June 4, 2024

**Subject:** Warden's and Supervisor's Response to Grievance

**Grievance:** 24-0148/00365819

Enclosed you will find a copy of your grievance with the ORIGINAL 'Inmate Grievance Response' form CR-1393. Please review this form which includes the warden' response and, if you would like to appeal, check (YES) or, if you don't want to appeal, check (NO). You must complete the CR-1393 by including your signature and date at the bottom where it indicates 'Grievant' and 'Date'.

Please note: if you fail to return the ORIGINAL CR-1393 signed, dated, and the (Yes) or (No) box checked, we will make a second attempt to contact you in regards to this grievance. If, after the second attempt, you still fail to respond, this grievance will be resolved due to failure of the grievant to participate in the grievance process.

Department of Correction * Riverbend Maximum Security Institution * 7475 Cockrill Bend Blvd. * Nashville, TN 37243 * 615-350-3361 * tn.gov/Correction

Case 3:21-cv-00666    Document 77-3    Filed 07/17/24    Page 11 of 50 PageID #: 1288

STATE OF _Tennessee_ )

) **S/S AFFIDAVIT OF** _Nikolaus L. Johnson_

COUNTY OF _Davidson_ )

**To whom it may concern:** this is an **Affidavit of Complaint**

**1. I AM A WITNESS** to the event in question that occurred on the _27_ day of _April_ 202_4_. I am over the age of eighteen, of sound mind, and competent to make the relevant statements contained in this declaration, admissible under **_Federal Rules of Evidence, Rule 401._** **MY NAME IS:** _Nikolaus L. Johnson # 421256_

**2. MY ADDRESS IS:** _7475 Cockrill Bend Blvd / Nashville, TN 37209_

**3. THIS IS MY STATEMENT** about what happened, when I saw, overheard, or otherwise know about the following incident in question, by saying: "this is a true and correct account of this event, based on my personal knowledge of: **who,** did **what, where,** to **whom, when, how** and **why.**" This statement shows my knowledge of these relevant listed facts. **MY INFORMATION IS AS STATED:** _Prior to me writing my grievance, B&C levels were being told by Officers, recreation does not run on the week-ends, and we were not able to go outside on the week-ends for a long period of time, every weekend. On April 27th, I was asking Cpl. Sweeny, about going outside to recreation, in which she became confrontational to me, inquiring rather or not we could go outside._

"I _Nikolaus L. Johnson_ , **DECLARE UNDER THE PENALTY OF PERJURY,** that the foregoing information is true and correct, and based upon first hand knowledge." **_Carter v. Clark,_** 616 F.2d 228 (5th Cir. 1980) **(28 U.S.C. § 1746;** declaration under the penalty of perjury). "Further deponent says not."

**EXECUTED ON:** _5_ day of _04_ 202_4_. **Signature:** _Nikolaus L. Johnson_

STATE OF TENNESSEE)
                  )          SS. **AFFIDAVIT OF** _____ ? **PURPOSE / DIRECTIONS.**
COUNTY OF DAVIDSON)

To draft legal pleadings in the court, you must have a clear understanding of the problem. You write down all the facts related to your problem in a narrative (story) form. Legal research is based on facts; without them, the law is meaningless. The most common mistake of pro se litigants is to fail to state the facts clearly and adequately for the Court. Remember, the court already knows something about law; but it knows nothing about the facts except what you tell it.

**AFFIDAVIT OF INDIGENCY:** Affiant swears he is too poor to afford costs, fees, or hire an attorney etceteras. Make it simple, concise, and direct. Federal Rules of Civil Procedure, Rule 8.

**AFFIDAVIT OF VERIFICATION:** The affiant swears that the facts stated in another document are true to his knowledge, and that facts stated on information and belief are true to the best of his knowledge and belief. State claims of fraud, with intent, knowledge, and malice FRCP, Rule 9.

The person swearing to is the affiant or deponent. At the bottom of the affidavit, allow a place for the signature of the affiant. Below the affiant's signature provide a statement that the affidavit was sworn to before the notary on such and such a date, and leave a space for the notary's signature. The affiant swears that the stated facts are true and correct, based upon their first hand information of the facts stated therein to the best of their own knowledge and belief.

Swearing to untrue facts in an affidavit might subject you to criminal liability (conviction and sentence) for perjury, false swearing, contempt of court, or fraud. Once you have marshalled the facts, you will then form **LEGAL QUESTIONS** based on these facts to guide you in your research.

Marshall all the facts of an issue together on paper in an order in when they occurred. The courts will only deal with facts. *Marrin v. Pinto,* 463 F.2d 583, 584 (3d Cir. 1972) (general conclusionary allegations that the food is bad and the living conditions are miserable are not enough). The *statement of facts* assist you writing your complaint, motion, or brief. Your facts must not contain "conclusionary statements," such as "the warden is trying to stop all litigation against him." Begin an numbered paragraph in a narrative style using a **statement of facts,** that show:

*what happened,*
*to whom it happened,*          **STATUTORY LAWS:** State all facts and elements
*where it happened,*                           necessary to constitutute a
*how it happened, and*                         breach of the written law.
*why it happened.*

You should swear only to facts that are within your personal knowledge. If you believe something is true, but did not observe it, you may state that it is true on information and belief.

"I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct." *Carter v. Clark,* 616 F.2d 228 (5th Cir. 1980) **(28 U.S.C. § 1746;** declaration under the penalty of perjury). "Further deponent says not."

**EXECUTED ON:** _____ (date); **Signature:** _____.

**PROOF OF SERVICE:** Affiant swears document mailed on a particular date. For example:

I _____, hereby certify I mailed a true & exact copy of foregoing affidavit of _____ to: (1) _____
Nashvile, Tenn. 37201 (2) Tennessee Attorney General, P.O. Box 20207, Nashville, Tenn. 37202; and (3) U.S. District Court, 801 Broadway Room 825, US Courthouse, Nashville, Tenn. 37203, via U.S. first class mail on this the ____ day of _____ 202___.



# TENNESSEE DEPARTMENT OF CORRECTION
## INMATE GRIEVANCE

RECEIVE
MAR 2 5 2024
GRIEVANCE OFFICE
RMSI

NAME: _Nikolaus L Johnson_  NUMBER: _421294_  INSTITUTION & UNIT: _RMSI  Unit 2A/07_

DESCRIPTION OF PROBLEM: _per policy #508.03 B(1)(a) we suppose to get Individual exercise - 2 hours per day, We don't get rec on the weekends at all. Last week, we only went out 3 days on the weekdays._

REQUESTED SOLUTION: _I would like rec to get back to the way it suppose to be. 7 days a week 2 hours per day_

_Nikolaus L Johnson_
Signature of Grievant

DATE: _3/18/24_

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

*TO BE COMPLETED BY GRIEVANCE CLERK*

Grievance Number: _24-0089/00364960_   Date Received: _3/25/2024_   Signature Of Grievance Clerk: _Vivian Tuam_

INMATE GRIEVANCE COMMITTEE'S RESPONSE DUE DATE:

AUTHORIZED EXTENSION: _04/26/24_
New Due Date: _04/16/24_   Signature of Grievant: _Nikolaus L Johnson_

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

_4/02/24_   **INMATE GRIEVANCE RESPONSE**

Summary of Supervisor's Response/Evidence: _See CR-3148_

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

_04/04/24_
Chairperson's Response and Reason(s): _Supervisor Response Acknowledged_

DATE: _03/29/24_   CHAIRPERSON: _Cpl. SW_

RECEIVED
APR 1 5 2024
By Grievance

Do you wish to appeal this response? _____ YES _____ NO

If yes: Sign, date, and return to chairman for processing within five (5) days of receipt of first-level response.

_Nikolaus L Johnson_   _4/04/24_   _J.E.66x Carl Hawl 04/15/24_
GRIEVANT   DATE   WITNESS
_04/04/24_                                                   _received_

Distribution Upon Final Resolution:
White - Inmate Grievant    Canary – Warden    Pink – Grievance Committee    Goldenrod – Commissioner (if applicable)

CR-1394 (Rev. 3-00)                        Page 1 of 2                        RDA 2244

*Jon Hall's Exhibit [2], 8 pages*



# TENNESSEE DEPARTMENT OF **CORRECTION**

## RESPONSE OF SUPERVISOR OF GRIEVED EMPLOYEE OR DEPARTMENT

DATE: 3/25/2024

Please respond to the attached grievance, indicating any action taken.

Date Due: 4/1/2024

24-0089/00384960
Grievance Number

Johnson, Nickolus
Inmate Name

421716
Inmate Number

Inmate Johnson

The following is noted, the supervisor in charge on that day is new to the facility. He has been coached and understands the policy now.

_Unit Manager Davis_
SIGNATURE

03/26/2024
DATE



**Department of**
**Correction**

# MEMO

| | |
|---|---|
| **To:** | Unit Manager Davis |
| **From:** | Cpl. S. Ward, RMSI Grievance Chairperson |
| **Date:** | March 25, 2024 |
| **Subject:** | Supervisor's Response Requested (CR-3148) |
| **Grievance:** | 24-0089/00364960 |

**Grievant:** Nickolus Johnson, #421296          Unit/Location: 2A107

The inmate listed above has filed a grievance pertaining to your department or area of responsibility. As a result, I need you to complete form CR-3148 with a Supervisor Response that specifically addresses the grievant's concern. You may complete the form electronically and e-mail it to me or complete the enclosed form and mail it back to the Grievance Office.

It is our goal to resolve all grievances at the lowest level possible. I ask that, if possible, please attempt to resolve the complaint with the grievant. If you get the issue resolved, please complete the following steps:

»» Complete the CR-3148, Supervisor Response form. Allow the grievant to review your response.

»» At the bottom of the Inmate Grievance Form (CR-1394), have the grievant check the NO box next to the ' Do you wish to appeal this response?' question.

»» Make sure the grievant signs and dates the CR-1394.

»» You sign the Witness line and return all paperwork to the Grievance Office.

If you are unable to resolve the issue, please complete the enclosed Supervisor's Response (CR-3148) as requested in the instructions at the opening of this memo and return it to the Grievance Office by the listed date.

Thank you for your help.

Department of Correction * Riverbend Maximum Security Institution * 7475 Cockrill Bend
Blvd. * Nashville, TN 37243 * 615-350-3361 * tn.gov/Correction



TENNESSEE DEPARTMENT OF CORRECTION

**RESPONSE OF SUPERVISOR OF GRIEVED EMPLOYEE OR DEPARTMENT**

DATE: 3/25/2024

Please respond to the attached grievance, indicating any action taken.

Date Due: 4/1/2024

24-0089/003349.60
Grievance Number

Johnson, Nickolus
Inmate Name

421296
Inmate Number

Inmate Johnson,

The following is noted., the supervisor in charge on that day., is new to the facility.
He has been coached and understands the policy now

_Unit Manager Davis_
SIGNATURE

03/26/2024
DATE

White - Inmate Grievant    Canary — Warden    Pink — Grievance Committee    Goldenrod — Commissioner

CR-3148 (Rev. 3-00)

RDA 2244

 **Department of Correction**

# MEMO

**To:**       Unit Manager Davis

**From:**     Cpl. S. Ward, RMSI Grievance Chairperson

**Date:**     March 25, 2024

**Subject:**  Supervisor's Response Requested (CR-3148)

**Grievance:**  24-0089/00364960

**Grievant:**   Nickolus Johnson, #421296          Unit/Location: 2A107

The inmate listed above has filed a grievance pertaining to your department or area of responsibility. As a result, I need you to complete form CR-3148 with a Supervisor Response that specifically addresses the grievant's concern. You may complete the form electronically and e-mail it to me or complete the enclosed form and mail it back to the Grievance Office.

It is our goal to resolve all grievances at the lowest level possible. I ask that, if possible, please attempt to resolve the complaint with the grievant. If you get the issue resolved, please complete the following steps:

»» Complete the CR-3148, Supervisor Response form. Allow the grievant to review your response.

»» At the bottom of the Inmate Grievance Form (CR-1394), have the grievant check the NO box next to the ' Do you wish to appeal this response?' question.

»» Make sure the grievant signs and dates the CR-1394.

»» You sign the Witness line and return all paperwork to the Grievance Office.

If you are unable to resolve the issue, please complete the enclosed Supervisor's Response (CR-3148) as requested in the instructions at the opening of this memo and return it to the Grievance Office by the listed date.

Thank you for your help.



# TENNESSEE DEPARTMENT OF CORRECTION

## RESPONSE OF SUPERVISOR OF GRIEVED EMPLOYEE OR DEPARTMENT

DATE: 3/25/2024

Please respond to the attached grievance, indicating any action taken.

Date Due: 4/1/2024

24-0089/003849660
Grievance Number

Johnson, Nickolus
Inmate Name

421296
Inmate Number

Inmate Johnson

The following is noted, the supervisor in charge on that day, is new to the facility.
He has been coached and understands the policy now.

Unit Manager Davis
SIGNATURE

03/26/2024
DATE

White - Inmate Grievant   Canary - Warden   Pink - Grievance Committee   Goldenrod - Commissioner

CR-3148 (Rev. 3-00)

RDA 2244

 **Department of Correction**

**MEMO**

**To:** Nickolus Johnson, #421296  Unit/Location: 2A107

**From:** Cpl. S. Ward, RMSI Grievance Chairperson

**Date:** March 29, 2024

**Subject:** Supervisor's Response to Grievance

**Grievance:** 24-0089/00364960

Enclosed you will find a copy of your grievance with the ORIGINAL FIRST PAGE of 'Inmate Grievance' form CR-1394. Please review this form which includes the supervisor's response and, if you would like to appeal, check (YES) or, if you don't want to appeal,check (NO). You must complete the CR-1394 by including your signature and date at the bottom where it indicates 'Grievant' and 'Date'.

Please note: If you fail to return the ORIGINAL CR-1394 signed, dated, and the (Yes) or (No) box checked, we will make a second attempt to contact you in regards to this grievance. If, after the second attempt, you still fail to respond, this grievance will be resolved due to failure of the grievant to participate in the grievance process.

Department of Correction * Riverbend Maximum Security Institution * 7475 Cockrill Bend Blvd. * Nashville, TN 37243 * 615-350-3361 * tn.gov/Correction



**State of Tennessee**
**Department of Corrections**
**Riverbend Maximum Security Institution**
7475 Cockrill Bend Blvd.
Nashville, Tennessee 37243
(615) 350-3100 ext. 3718

## Rebuttal Statement

**FROM:** Nikolaus L Johnson

**DATE:** 4/07/24

**Rebuttal Statement:** I am appealing this matter, because it clearly is not resolved. On 4/07/24, we was told by Cpl. Maj. that Captain Jones, gave the order, not to get rec. He said we don't get rec. on the weekends. The supervisor in charge was well informed of the policy, as well as read this grievance. The policy was over rode due to his supervisors orders. For whatever reasons, we have constantly been discriminated on. Recreation restriction is a form of punishment, that has constantly been done, simply because of my level status. If possible I would like TDOC Policy 503.03 C(1)(a) enforced, according to it's own rules, so we can have rec 2 hours per day like it says. Apparently, according to the officer, asking for rec is starting trouble. I'm just asking for what I am supposed to have, according to policy. Thank You!

# GRIEVANCE MINUTES

| Grievant: | Johnson, Nickolus | 421296 | 2A107 | 24-0089/00364960 |
|---|---|---|---|---|

| Chairperson: | Cpl. S. Ward | Board Members: | I.J.C. Robinson, Lakesha |
|---|---|---|---|
| | | | Counselor Webb, Shaska |
| Date: | 4/26/2024 | | I/M Jasper, Lewis |
| Advocate: | Rathal Perkins, #256162 | | I/M Miles, Joseph |

Below is a summary of the Grievance Hearing:

The Board Members read the grievance and the Supervisor's Response.

The grievant was asked if he had anything to add. Grievant stated, "According to policy 503.03, we are permitted to receive two hours of recreation a day seven days a week. The majority of the time we did not get our recreation per policy."

Board deliberated and requests that, policy 503.03 be enforced.



TENNESSEE DEPARTMENT OF CORRECTION
INMATE GRIEVANCE RESPONSE

| Johnson, Nickolus | 421296 | RMSI - 2A107 | 24-0089/00364960 |
|---|---|---|---|
| NAME | NUMBER | INSTITUTION & UNIT | GRIEVANCE NUMBER |

Summary and Testimony Presented to Committee    listed on the Hearing Minutes page, if applicable

Inmate Grievance Committee's Response and Reasons    Hearing was held in Unit 2 at 1:15 p.m.
Grievant stated, "According to policy 503.03, we are permitted to receive two hours of recreation a day seven
Board deliberated and requests that, policy 503.03 be enforced.

April 26, 2024
Date                                    CHAIRMAN                              MEMBER
Shawka Webb
MEMBER                                  MEMBER                               Josiyh Milks   MEMBER

Warden Response:        Agrees with Proposed Response          ☑

                        Disagrees with Proposed Response        ☐

    If Disagrees, Reasons for Disagreement    _____

**RECEIVED**

APR 29 2024

Riverbend Maximum Security Institution
Grievance Office

    Action Taken:    _____

DATE:  04/29/2024              WARDEN'S SIGNATURE:  Jason Clendenion

    Do you wish to appeal this response?  _____ YES  _____ NO
if yes:        Sign, date, and return to chairman for processing. Grievant may attach supplemental clarification of
            issues or rebuttal/reaction to previous responses if so desired.

| GRIEVANT | DATE | WITNESS |
|---|---|---|

Commissioner's Response and Reason(s): _____

| DATE | SIGNATURE |
|---|---|

White-Inmate   Canary-Warden   Pink- Grievance Committee   Goldenrod-Commissioner

CR -1393 (Rev. 3-00)                                                        RDA 2244



**Department of Correction**

# MEMO

To: **Unit 2 Staff and Inmates**
From: **Unit Manager Burnette** scB
Date: May 9th, 2024
Subject: **Unit 2 Daily Schedule**

**The following schedule shall be followed by Unit 2:**

0600: Shift Change
\*\*0630: A-level group meal (After good in house)
0730: Recreation B/C levels and D-pod
0800: Building 2-A opens, Legal Visits Begin, Religious Volunteers Arrive
0900: Cell Inspection (\*cells are to be cell inspection ready)
1030: 2-A Call out (last call out before count)
1100: Unit Lock Down
1115: Count Time
\*\*1130: A-level group meal (after good in house)
1200-1230: Count Cleared (Recreation processes)
1300: Religious Activities/School Programs
1545: Classes/Legal Visits/Recs are 10/10-Building 2-A Closed
1600: Unit Lock Down
1615: Count Time
\*\*1630: A-level group meal (after good in house)
\*1730: Monday Visitation starts
          \* Building 2-A will reopen (if needing hours)
1800: Shift Change

\*\* During group meals all doors are to remain closed. If you decide not to eat with the group but instead in your house; your door will also remain closed.

*✗ Max of 12 inmates out for group meal per pod*

✡ *Jon Hall's Exhibit [3]*
*1 Page*

STATE OF TENNESSEE    )
                      ) S/S    AFFIDAVIT OF: <u>Jonathan W. Stephenson #140145</u>
COUNTY OF DAVIDSON    )

To whom it may concern: this is an Affidavit of Complaint.

1. I AM A WITNESS to the event in question that occurred on the 27th day of April 2024. I am over the age of eighteen, of sound mind, and competent to make the relevant statements contained in this declaration, admissible under Federal Rules of Evidence, Rule 401. MY NAME IS: <u>Jonathan W. Stephenson</u>

2. MY ADDRESS IS: Riverbend Maximum Security Institution (R.M.S.I.) Unit 2, B pod, cell # 209, 7475 Cockrill Bend Blvd, Nashville, Tn. 37209.

3. THIS IS MY STATEMENT about what happened, when I saw, overheard, or otherwise know about the following incident in question, by saying: "this is a true and correct account of this event, based on my personal knowledge of: who, did what, where, to whom, when, how and why." This statement shows my knowledge of these relevant listed facts. MY INFORMATION IS AS STATED: I am the Law Clerk for the Death Row Unit, Unit 2. My statement is to verify that on the 27th day of April, 2024, the Law Library was open and Unit 2 inmates were allowed to participate in that particular program. Jon Hall #238941 usually avails himself to participate in the law library every chance he gets, including weekends and holidays. He did not show up to the Law Library on this particular date.

"I Jonathan W. Stephenson #140145, DECLARE UNDER THE PENALTY OF PERJURY, that the foregoing information is true and correct, and based upon firsthand knowledge." **Carter v. Clark, 616 F.2d 228 (5th Cir. 1980) (28 U.S.C. § 1746;** declaration under the penalty of perjury).

"Further deponent says not."

EXECUTED ON: 4th day of May 2024.

Signature: _Jonathan W. Stephenson_

✡ Jon Hall's Exhibit [H] 1 Page

STATE OF TENNESSEE)
) S/S **AFFIDAVIT OF HENRY LEE JONES**
COUNTY OF DAVIDSON)

## To whom it may concern this is an **Affidavit of Complaint**

**1. I AM A WITNESS** to the event in question that occured on the 27, day of April 2024. I am over the age of eighteen, of sound mind, and competent to make the relevant statements contained in this declaration, admissible under *Federal Rules of Evidence, Rule 401.* **MY NAME IS:**

*Henry Lee Jones #455040*

I am I/M Henry Lee Jones #455040 an inmate who was presence at this incident and witness Cpl.Sweeney misconduct toward I/M Hall.

**2. MY ADDRESS IS:** *Riverbend Maximum Security Institution (R.M.S.I.) Unit 2 A-pod, cell # 105 , 7475 Cockrill Bend Blvd, Nashville, Tn. 37209.*

*Henry Lee Jones #455040*

\* I/M Jon Hall did not make any verbal threats toward Cpl.Sweeney.

**3. THIS IS MY STATEMENT** about what happened, when I saw, overheard, or otherwise know about the following incident in question, by saying: "this is a true and correct account of this event, based on my personal knowledge of: who, did what, where, to whom, when, how and why." This statement shows my knowledge of these relevant listed facts. **MY INFORMATION IS AS STATED:**

\* I/M Hall did not make any threatens behavior toward Cpl.Sweeney. On April 27,2024 Cpl.Sweeney enter A-pod yelling very loud "Warden Zac Pounds no long RMSI Warden". TDOC ASSIST COMMISSIONER (acting as RMSI Warden,Mr.Clendenion).Then Cpl.Sweeney begin to talk with I/M Nickols Johnson #421296 (by yelling very loud).

Clp.Sweeney reappear back to A-POD.Then I/M Jones heard Cpl.Sweeney yelling very loud toward I/M Jon Hall.I/M Hall request/asked Cpl.Sweeney to call her "SHIFT CAPTAIN" (requetsing for help and assisted her with officer duties).Cpl.Sweeney got very loud and out control toward I/M Hall (Cpl.Sweeney begin to yell again toward I/M Hall) Quoted "YOU ARE DONE".Cpl.Sweeney didn't open I/M Hall cell ( A-pod 108).Cpl.Sweeney did not make any law library (2A Building) announcement.Final Statement Cpl.Sweeney are very disrespectful and unprofessionalism toward inmates (i/m Jones has witness Cpl.Sweeney being very disrespectful toward numerous of other inmates and incdent

**7** I/M Henry Lee Jones , **DECLARE UNDER THE PENALTY OF PERJURY,** that the foregoing information is true and correct, and based upon first-hand knowledge." *Carter v. Clark* 616 F.2d 228 (5th Cir. 1980) (28 U.S.C. § 1746; declaration under the penalty of perjury). "Further deponent says not."

\* I/M Hall did not make any threatens behavior toward Cpl.Sweeney.

**EXECUTED ON:** 28, day of April 2024. **Signature:** *Henry Lee Jones #455040*

*Jon Hall 05/02/24*

✡ Exhibit [5]
Page 1 of 2

ATTACH STATEMENT

I (I/M Henry Lee Jones #455040) final comment of this incident (I/M Hall).

This incident was not investigated, because no officer/staff approach I/M Jones concerning this matter (I/M Hall incident).

Cpl.Sweeney attempting to cover up and justify her misconduct,unprofessionalism and disrespectful behavior toward inmates.
These are very serous allagation CPL.SWEENEY Making against inmates (verbal threats toward a staff or official).

No official/staff came into UNIT-2 A-POD to investigated this incidents that occured between I/M Jon Hall and Cpl.Sweeney.

Cpl.Sweeney are not obeying and following TDOC POLICIES/Rules for death sentence inmates and housing (TDOC POLICIES/RULES #503.03).

No official/staff has the authority to change the FEDERAL COURTS ORDER or change TDOC POLICIES/RULES #503.03 without an court hearing or without good reason (good legal reason).

RMSI/TDOC death sentence programs are order under federal judge. Please review TDOC POLICIES/RULES UNDER #503.03.

Signature: *Henry Lee Jones #455040*     April29,2024

> I/M Henry Lee Jones #455040
> RMSI unit-2 A-pod,cell-105.
> 7475 cockrill Bend Blvd,
> Nashville, TN.37209-148

*Jon Hall 05/02/24*

Exhibit [5]
Page 2 of 2



**EXHIBIT**

SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into effective as of the last date signed below ("Effective Date") by and between Jon Hall ("Mr. Hall") on the one hand, and Lisa Helton, in her official capacity as Interim Commissioner of the Tennessee Department of Correction ("Commissioner Helton"), Tony Mays, in his official capacity as Warden of Riverbend Maximum Security Institution ("Warden Mays") and George Nevelson in his official capacity as Unit Manager of Riverbend Maximum Security Institution ("Unit Manager Struthers") on the other (Commissioner Helton, Warden Mays, and Unit Manager Struthers, collectively, the "Tennessee Department of Correction" and Mr. Hall and the Tennessee Department of Correction individually, "Party," and collectively, "Parties"):

RECITALS

WHEREAS, Mr. Hall, Tennessee Department of Correction Inmate #238941, is serving a sentence on death row at Riverbend Maximum Security Institution ("RMSI"), located in Nashville, Tennessee;

WHEREAS, all death row inmates at RMSI live in a housing unit known as Unit II ("Unit II");

WHEREAS, on July 24, 2019, Mr. Hall commenced a lawsuit pro se in the United States District Court for the Middle District of Tennessee against multiple government officials and officials of the Tennessee Department of Correction alleging violations of his civil rights in connection with his living conditions on Unit II;

WHEREAS, by court order on October 2, 2019, the United States District Court for the Middle District of Tennessee appointed Bill Harbison ("Mr. Harbison") and Lisa Deborah ("Ms. Deborah") of the law firm Sherrard Roe Voigt & Harbison, PLC ("SRVH") as legal counsel for Mr. Hall;

WHEREAS, on April 7, 2020, through counsel, Mr. Hall filed a fourth amended complaint, styled as Jon Hall v. Tony Parker et al., No. 3:19-cv-00628, against the Tennessee Department of Correction in the United States District Court for the Middle District of Tennessee ("Action");

WHEREAS, in the Action, Mr. Hall alleged that conditions on Unit II violated his rights under the Eighth and Fourteenth Amendments of the United States Constitution, the federal Americans with Disabilities Act, and Tenn. Code Ann. § 41-21-402 ("Mr. Hall's Claims");

WHEREAS, the Tennessee Department of Correction denies all of Mr. Hall's Claims and has defended the Action accordingly;

WHEREAS, the Parties have engaged in extensive discovery and settlement negotiations in an effort to resolve the Action;

WHEREAS, by court order on July 27, 2021, Mr. Bradley A. MacLean ("Mr. MacLean") was appointed as a Special Master of Mr. Hall for the purpose of mediation and settlement discussions; and

WHEREAS, without conceding any claims or defenses raised in the Action, the Parties now wish to resolve the Action and Mr. Hall's Claims amicably to avoid the risks and expense of further litigation;

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein, the mutual execution of this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby specifically contract, covenant, and agree as follows:

I. GENERAL PROVISIONS

1. Recitals. The foregoing recitals are contractual in nature and are mutual representations of the Parties.

2. Warranty and Voluntary Agreement. Mr. Hall and the Tennessee Department of Correction warrant that they have entered into this Agreement voluntarily and of their own accord without reliance on any inducement, promise, or representation by any other Party, except those specifically set forth in this Agreement. This Agreement contains and constitutes the entire understanding and agreement between Mr. Hall and the Tennessee Department of Correction respecting the subject matter hereof, and all oral discussions and prior agreements are merged herein.

3. Warranty of Understanding and Acknowledgment. Mr. MacLean, in his capacity as Mr. Hall's guardian ad litem, and the Tennessee Department of Correction each certify and represent that they have read this Agreement, know and understand its contents, and freely and voluntarily agree to all of its terms and conditions.

4. Additional Legal Proceedings. It is expressly understood and agreed that this Agreement is entered into solely to avoid the expense and uncertainty of additional legal proceedings. This Agreement is made to compromise and resolve all claims of any kind whatsoever proceeding, by settlement or otherwise, on request of any of the Parties.

5. Authorization. Except to the extent any provision is preempted by federal law the applicable laws, the validity, construction, and enforcement of this Agreement shall be governed by the laws of the State of Tennessee without giving effect to any choice of law or conflict of law provisions of that (whether of the State of Tennessee or any other jurisdiction) that would cause the application of the law of any jurisdiction other than the State of Tennessee.

6. Amendment and Waiver in Writing. No provision of this Agreement can be amended or waived, except by a statement in writing signed by the Party against which enforcement of the amendment or waiver is sought, and any such waiver shall apply only to the matter or instance specifically waived.

7. Severability. Should any provision of this Agreement be declared invalid or unenforceable by operation of law or by any tribunal of competent jurisdiction for any reason, the remaining provisions hereof shall remain in full force and effect.

8. Arms-Length Negotiation. This Agreement has been jointly negotiated. The language of this Agreement shall be construed as a whole according to its fair meaning and not strictly construed for or against any Party.

9. Authorization. The representatives executing this Agreement on behalf of the Parties are empowered to do so and thereby bind the Parties according to the terms of this Agreement.

10. Further Assurances. The Parties agree to take all actions reasonably necessary to effectuate the approval, performance, validity, and enforceability of this Agreement.

11. Counterparts. This Agreement may be executed simultaneously in several counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The delivery of an electronically-signed, electronically-scanned, or electronically-copied signature of a party hereto shall be considered as if it was the original.

II. CHANGES TO CONDITIONS OF CONFINEMENT

12. Policy Changes. On or before April 1, 2022, the Tennessee Department of Correction shall implement the revised Tennessee Department of Correction Policy 503.03 entitled "Program Levels for Inmates Under Sentence of Death" attached hereto as Exhibit A ("Revised Policy 503.03"). The Tennessee Department of Correction does review and revise policies on a regular basis. TDOC agrees that, to the extent of any change to Policy 503.03, the change will not affect the matters that the Parties have agreed to with respect to Mr. Hall in this Agreement.

13. Structural Changes. On or before April 1, 2022, the Tennessee Department of Correction shall complete the installation of mesh cages over the entrances of nine (9) lower tier C-pod cells, as reflected in Exhibit B attached hereto ("Mesh Cages").

14. Socialization Opportunities for Level C Inmates. The Parties acknowledge and agree that the purpose of the Mesh Cages is to provide inmates assigned to Program Levels B and C under Revised Policy 503.03 more opportunities to participate in group programming and socialization. Within thirty (30) days of completion of the Mesh Cages, the Tennessee Department of Correction shall update Revised Policy 503.03 to reflect that Level B and C inmates are offered the same opportunities to participate in group programming as Level A inmates. Level C inmates may participate via the Mesh Cages.

III. MR. HALL'S TREATMENT PLAN

15. Individualized Treatment Plan. Upon the Effective Date, the Tennessee Department of Correction shall continue to ensure that Mr. Hall receives, at a minimum, the following services:

    a. medication management two (2) times monthly;

    b. individual therapy out of cell two (2) times weekly;

    c. daily cell door check-ins from behavioral health staff;

    d. weekly therapeutic worksheets documented as progress notes; and

    e. weekly recreational therapeutic activities documented as progress notes

(collectively, "Individualized Treatment Plan").

The Tennessee Department of Correction acknowledges and agrees that the Individualized Treatment Plan shall remain in place for Mr. Hall so long as there are no significant disciplinary infractions or change of status. If there is a change due to a significant disciplinary infraction or status change, the Tennessee Department of Correction will notify Mr. Harbison, Ms. Deborah, under Mr. MacLean. Upon request, the Tennessee Department of Correction shall provide Mr. Harbison, Mr. Osborne, and/or Mr. MacLean with documentation evidencing the implementation of the Individualized Treatment Plan.

IV. ATTORNEY'S FEES AND RELATED COSTS & PAYMENT

16. Attorney's Fees and Costs. The Tennessee Department of Correction shall pay $725,000.00 to Mr. Hall in complete satisfaction of any and all of Mr. Hall's claims for attorney's fees and costs within fifteen (15) business days of the Effective Date ("Fee Payment"). The Fee Payment shall be made by check and delivered to Sherrard Roe Voigt & Harbison, PLC within thirty (30) days of the Effective Date.

17. Payment to Mr. Hall. Within thirty (30) days of the Effective Date, the Tennessee Department of Correction shall pay $3,000.00 to Mr. Hall by depositing such sum into his inmate trust fund account ("Individual Payment"). Mr. Hall may use the Individual Payment as he wishes in accordance with any Tennessee Department of Correction policies applicable to inmate trust fund accounts.

V. NOTICE

All notices and other communications required or permitted under this Agreement shall be considered validly given, made, or served if in writing and delivered personally, by nationally recognized overnight express courier, or by certified mail with postage prepaid and return receipt requested, to the following addresses:

*If to Mr. Hall:*

Attention: William L. Harbison and Eric G. Osborne
Sherrard Roe Voigt & Harbison, PLC
150 3rd Avenue South, Suite 1100
Nashville, Tennessee 37201
bharbison@srvhlaw.com | eosborne@srvhlaw.com

*and*

Bradley A. MacLean
1702 Villa Place
Nashville, TN 37212
brad.maclean9@gmail.com

*If to Tennessee Department of Correction:*

Debra K. Inglis
General Counsel and Deputy Commissioner, Tennessee Department of Correction
320 6th Avenue North, 6th Floor
Rachel Jackson Building
Nashville, TN 37243
Debra.Inglis@tn.gov

The Parties further agree to give notice by email in conjunction with any of the above listed methods for physical delivery; however, email alone will not constitute notice to a Party under this provision unless the Party being notified responds in writing (email sufficient) to acknowledge receipt and sufficiency of the emailed notice.

## V. MONITORING AND ENFORCEMENT OF AGREEMENT

18. **Dismissal; Forum; and Jurisdiction.** Within five (5) days after both receipt of the Fee Payment and deposit of the Individual Payment, the Parties shall file a joint motion to dismiss the Action in the United States District Court for the Middle District of Tennessee ("Dismissal"). Such Dismissal shall provide that the United States District Court for the Middle District of Tennessee shall retain jurisdiction over the Parties to seek remedies for any breach of the Agreement. The Parties hereby consent to personal jurisdiction and venue in the United States District Court for the Middle District of Tennessee.

19. **Monitoring.** In the event that Mr. Hall is charged with a disciplinary infraction or experiences a change in his program level under Policy 503.03, the Tennessee Department of Correction shall notify Mr. Harbison, Mr. Osborne, and Mr. MacLean pursuant to Section V within five (5) days of the infraction or the change in status. Such notice shall contain a summary, explanation, and list of parties involved in the infraction or the change in status.

5

20. **Visitation.** Mr. Harbison, Mr. Osborne, and Mr. MacLean shall be entitled to visit Mr. Hall, individually or collectively, on a regular basis in accordance with RMSI and Tennessee Department of Correction policies regarding inmate visitation with legal counsel. Mr. Harbison, Mr. Osborne, and Mr. MacLean shall be considered Mr. Hall's legal counsel for purposes of visitation until Mr. Hall's death or release from prison.

21. **Remedies.** In the event of any breach of this Agreement, the Parties shall have all remedies that may be available to them at law or in equity, except the right to rescind or invalidate the Agreement. In the event of any material breach of this Agreement, the substantially prevailing party shall be entitled to an award of its reasonable attorney's fees incurred, as well as all costs and expenses of litigation and collection.

IN WITNESS WHEREOF, the parties have signed the Agreement on the date(s) shown below:

[SIGNATURE PAGE TO FOLLOW]

6

Jon Hall

By: _____
    Bradley A. MacLean

*In his capacity as Mr. Hall's Guardian Ad Litem*

Date: 3/25/22

Tennessee Department of Correction:

By: _____
    Lisa Helton

*In her official capacity as its Interim Commissioner*

Date: 3/25/22

7

| ADMINISTRATIVE POLICIES AND PROCEDURES<br>State of Tennessee<br>Department of Correction | Index #: 503.03 | Page 1 of 7 |
|---|---|---|
| | Effective Date: March 15, 2018 | |
| | Distribution: LD | |
| | Supersedes: 503.03 (3/15/15)<br>PCN 17-34 (3/31/17) | |
| Approved by: Tony Parker | | |
| Subject: PROGRAM LEVELS FOR INMATES UNDER SENTENCE OF DEATH | | |

I. **AUTHORITY:** TCA 4-3-603 and TCA 4-3-606.

II. **PURPOSE:** To establish criteria and procedures for a review process and criteria for the assignment of program levels for inmates sentenced to death.

III. **APPLICATION:** To all Tennessee Department of Correction (TDOC) employees and to all inmates under the sentence of death.

IV. **DEFINITIONS:**

A. **Behavioral Health Administrator (BHA):** A licensed or qualified mental health professional approved by the Warden/Superintendent and the Director of Behavioral Health Services to assume the responsibility of coordinating the delivery of behavioral health services.

B. **Program Level:** An assigned assessment which provides for specified work and programmatic activities of an inmate sentenced to death.

C. **Qualified Mental Health Professional:** For purposes of this policy, a licensed psychological examiner or other individual who is professionally licensed/certified as a therapeutic professional or a mental health professional having a master's degree in the behavioral sciences.

D. **Unit Manager:** For purposes of this policy only, an employee appointed by the Warden who is responsible for the overall operation of all phases of the unit for inmates sentenced to death which includes programming within the housing unit or zone.

E. **Unit Review Panel:** A group of staff appointed by the Warden who meet regularly to assess an inmate's current circumstances and make recommendations for any suitable changes in the inmate's status.

V. **POLICY:** The unit review panel shall assess all available information regarding an inmate sentenced to death to ensure that appropriate recommendations are made regarding the inmate's program level status and periodically make recommendations for any appropriate changes in the inmate's assigned program level. All inmates sentenced to death shall be assigned into a program level.

VI. **PROCEDURES:**

A. Inmates received by the TDOC who are sentenced to death shall be initially classified in accordance with Policy #401.04 and assigned to Program Level C. All housing and programming of permanently assigned inmates sentenced to death shall occur within the following units:

   1. RMSI Unit 2, Building 2A, and Unit 1 (available only for overflow as necessary)

2. TPPW-Unit 3

B. The Warden shall appoint the Unit Review Panel. The Panel shall meet every thirty days to conduct a comprehensive diagnostic review/interview of each inmate's level. The unit Review panel shall consist of:

1. Chairperson: Unit Manager (Alternate: Chief Counselor)

2. Members (1): ranking officer/correctional officer.

3. Member of the facilities Behavioral Health staff

4. Member of the Treatment Team

C. Level C inmates shall not be scheduled to meet the Unit Review Panel until they have fulfilled a complete eighteen months in Level C.

1. If the inmate has experienced a significant absence from the program during the initial 12 month period on Level C, the review shall be delayed for a corresponding period.

2. Unless this review is further delayed in accordance with (C)(1), if the inmate is temporarily away from his/her permanent assigned facility when the 12 month review is due, the review shall be completed within 30 days upon the inmate's return.

D. Subsequent reviews shall be scheduled so that each inmate under the sentence of death is reviewed by the unit review panel for his/her progress and adjustment, or for level advancement consideration, if eligible. Inmates sentenced to death shall be reclassified at least annually in accordance with Policy #401.04. Reviews occur in accordance with the following schedule:

1. Level C and B within six months or as necessary or due to administrative or disciplinary reasons.

2. Level A within 12 months or as necessary due to administrative or disciplinary reasons.

E. Inmates shall be provided the opportunity to be present during their hearings before the unit review panel. Inmates who refuse to appear before the unit review panel are subject to reduction of level assignment.

F. Conviction of any disciplinary infraction will automatically result in a review by the unit review panel and possible reassignment to an appropriate program level.

G. On a weekly basis, the Unit Adjustment Form, CR-3343, shall be completed by a unit team member. This form provides documentation of observed inmate behavior, staff perceptions of the inmate's adjustment to unit activities, and a description of the inmate's interaction with staff and other inmates.

---

H. On a weekly basis, the Cell Inspection Form, CR-3115, shall be completed by a unit team member. This form includes a checklist of observable items which shall be inspected for cleanliness, damage, obstructions, neatness and contraband.

I. The unit review panel, when reviewing an inmate for program level assessment, shall review all completed CR-3343 forms and CR-3115 forms completed during the time frame of the review. In addition, the following items shall be considered by the panel when recommending a level change:

1. Inmate's disciplinary record

2. Past criminal record

3. Past record of incarceration(s)

4. Criminal activity in prison or jail

5. Record of violent reactions to stressful situations

6. Institutional record on work/education assignment

7. Adjustment to unit activities

8. Willingness and ability to live harmoniously among others

9. Incompatibility with other inmates

10. Attitude toward authority

11. Personal hygiene

12. Involvement in STG activities

13. Psychological, psychiatric, and/or other behavioral health or medical evaluations completed within the past six months as provided by the institutional medical staff.

14. Other information or special consideration that may reflect on the appropriateness of the level placement.

J. Program level assignments recommended by the unit review panel are subject to the approval of the unit manager and Associate Warden of Security.

1. Actions shall be documented on the Unit Review Panel Hearing Sheet, CR-2937.

2. The specific reasons for unit level review decisions must be stated and shall include consideration of behavioral health concerns identified in the course of evaluation pursuant to paragraph I.13 foregoing.

---

3. Any level change from Level C requires the approval of the Warden. Inmates may appeal final decisions using Classification Appeal, CR-3004.

K. Inmates shall be assigned to program levels as follows:

1. Level C: All newly death sentenced inmates received at an institution shall be placed in Level C. An inmate shall remain at this level for a total of 12 months prior to receiving consideration for Level B. Available programming activities:

   a. Individual exercise – two hours per day

   b. Individual religious counseling

   c. All C level prisoners will receive a visit from the mental health team at least once every 30 days and will be given the opportunity to participate in a private out-of-cell meeting with mental health staff.

   d. Individual education

   e. Legal help from inmate legal assistants, on a non-contact visit basis, not to exceed a total of two hours each week as scheduled by the unit manager/designee.

   f. Non-contact visitation twice a week (for no more than one hour per visit. After 12 months at Level C, a contact visit may be granted by the Associate Warden of Security based upon a favorable review of Section VI. (I)(5,6,7,8,10, and 11)

   g. Limited to one package every six months.

   h. Restraints shall be mandatory for all inmates classified to this level.

   i. May participate in in-cell arts and crafts on an individual basis, at the discretion of the Warden, according to demonstration of appropriate behavior.

2. Level B: An inmate must remain at this level for 9 months, disciplinary-free, prior to receiving consideration for Level A placement pending review in accordance with Section VI.(F). Available programming activities:

   a. Participate in groups of six or less for the following:

      (1) Education

      (2) Exercise – a minimum of two hours per day

      (3) Religious services/activities

      (4) Individual group counseling

---

      (5) Legal help from inmate legal assistants, on a non-contact visit basis, not to exceed a total of two hours each week as scheduled by the unit manager/designee.

   b. Contact or non-contact visits, at the discretion of the Associate Warden of Security – twice a week for a total of three hours maximum

   c. Limited to one package every three months

   d. Restraints shall be mandatory for all inmates classified to this level. Restraints may be removed while an inmate is in a conference area or treatment area at the discretion of the unit manager. Wardens shall develop policies and procedures setting forth restraint procedures when inmates are out of their cells.

3. Level A: Inmates at this level must maintain an overall exceptional rating in the unit and remain free from disciplinary convictions, pending review in accordance with Section VI (D). Available programming activities:

   a. Participation in the following activities in groups (of other inmates under sentence of death) at the discretion of the unit manager:

      (1) Exercise - a minimum of two hours per day

      (2) Education

      (3) Arts and crafts, if available

      (4) Religious services/activities

      (5) Individual or group counseling

      (6) Group dinners, if appropriate and approved by the unit manager

      (7) Cards and certain boards games, if appropriate and approved by the unit manager

      (8) Use of active/passive multipurpose rooms as designated by the unit manager

      (9) Law clerk or legal advisor from the population shall visit in the non-contact visiting area not to exceed one hour per day as scheduled by the unit manager, Monday through Friday. Access to library shall be established in local policies and procedures.

      (10) Movement in and out of their cells within the unit and exercise yards without restraints.

   c. Contact visits – twice a week for a total of three hours or more, depending on space availability, as approved by the Associate Warden of Security.

    d.   Limited to one package every three months.

L.   If an inmate on any level elects not to participate in recreation or group programming for a period of thirty days or more, unit manager shall notify the Behavioral Health Administrator.

    a.   The Behavioral Health Administrator shall upon receipt of such notice arrange for a Qualified Mental Health Professional (QMHP) to conduct an assessment of the inmate's mental health condition.

    b.   Upon completion of the assessment, the QMHP shall recommend to the Behavioral Health Administrator and unit manager any recommendation for an immediate clinical intervention. The QMHP shall in all events document the findings and recommendations from the assessment, on the problem-oriented, CR-1884.

M.   Regardless of the disciplinary sanction imposed on an offender by reason of conviction for a disciplinary infraction, an offender on death row may be demoted one level or two levels. When an offender receives a demotion they will not be eligible for a level increase for a period of between 3 and 12 months depending on the severity of the infraction, as determined by the following matrix:

| Offender level | Disc. Class | New Level | Consideration |
|---|---|---|---|
| A | A | C | 12 months |
| A | B | B | 6 months |
| A | C | B | 3 months |
| B | A | C | 12 months |
| B | B | C | 6 months |
| B | C | C | 3 months |
| C | A | C | 12 months |
| C | B | C | 6 months |
| C | C | C | 3 months |

N.   Program assignments to Level A or B and the housing assignments of inmates under sentence of death who is permanently assigned to a facility other than RMSI or TPW shall be approved or disapproved by the Assistant Commissioner of Prisons/designee. The Assistant Commissioner of Prisons/designee shall consider all relevant circumstances including, but not limited to, the following:

    1.   The safety of the inmate

    2.   The safety of other inmates

---

    3.   The security of the Institution

N.   Any exceptions to this policy require the prior approval of the Commissioner.

O.   The Warden of any facility permanently housing inmates under sentence of death shall develop local policies and procedures to administer this policy. These policies require the:

P.   News Media - contact with news media shall be in accordance with Policy #103.04.

Q.   Inmates in all levels shall be in full restraints when he/she leaves the building for medical, court, etc. Inmates assigned to Deberry Special Needs Facility for medical/behavioral health reasons will be treated as a level C inmate.

VII.   **ACA STANDARDS:** None.

VIII.   **EXPIRATION DATE:** March 15, 2021.

---

| | ADMINISTRATIVE POLICIES AND PROCEDURES State of Tennessee Department of Correction | Index #: 503.03 | Page 1 of 9 |
|---|---|---|---|
|  | | Effective Date: February 1, 2022 | |
| | | Distribution: LD | |
| | | Supersedes: 503.03 (3/15/18) | |
| Approved by: | *[signature]* | | |
| Subject: PROGRAM LEVELS FOR INMATES UNDER SENTENCE OF DEATH | | | |

I.   **AUTHORITY:** TCA 4-3-603 and TCA 4-3-606.

II.   **PURPOSE:** To establish criteria and procedures for a review process and criteria for the assignment of program levels for inmates sentenced to death.

III.   **APPLICATION:** To all Tennessee Department of Correction (TDOC) employees and to all inmates under the sentence of death.

IV.   **DEFINITIONS:**

A.   **Behavioral Health Administrator (BHA):** A licensed or qualified mental health professional approved by the Warden/Superintendent and the Director of Behavioral Health Services to assume the responsibility of coordinating the delivery of behavioral health services.

B.   **Program Level:** An assigned assessment which provides for specified work and programmatic activities of an inmate sentenced to death.

C.   **Qualified Mental Health Professional:** For purposes of this policy, a licensed psychological examiner or other mental health who is professionally licensed/certified as a therapeutic professional or a mental health professional having a master's degree in the behavioral sciences.

D.   **Unit Manager:** For purposes of this policy only, an employee appointed by the Warden who is responsible for the overall operation of all phases of the unit for inmates sentenced to death which includes programming within the housing unit or zone.

E.   **Unit Review Panel:** A group of staff appointed by the Warden who meet regularly to assess an inmate's current circumstances and make recommendations for any suitable changes in the inmate's status.

V.   **POLICY:** The unit review panel shall assess all available information regarding an inmate sentenced to death to ensure that appropriate recommendations are made regarding the inmate's program/work status and periodically make recommendations for any appropriate changes in the inmate's assigned program level. All inmates sentenced to death shall be assigned into a program level.

VI.   **PROCEDURES:**

A.   Inmates received by the TDOC who are sentenced to death shall be initially classified in accordance with Policy #401.04 and assigned to Program Level C. All housing and programming of permanently assigned inmates sentenced to death shall occur within the following units:

    1.   RMSI-Unit 2, Building 2A, and Unit 1 (available only for overflow as necessary).

---

    2.   DJRC-Unit 3.

B.   The Warden shall appoint the unit review panel. The Panel shall meet every thirty days to conduct a comprehensive diagnostic review/interview of each inmate's level. The unit review panel shall consist of:

    1.   Chairperson unit manager (Alternate: Chief Counselor).

    2.   Members (1): ranking officer/correctional officer.

    3.   Member of the facilities Behavioral Health staff.

    4.   Member of the Treatment Team.

C.   Level C inmates shall not be scheduled to meet the unit review panel until they have fulfilled a complete eighteen months in Level C.

    1.   If the inmate has experienced a significant absence from the program during the initial 12-month period on Level C, the review shall be delayed for a corresponding period.

    2.   Unless the review is further delayed in accordance with (C)(1), if the inmate is temporarily away from his/her permanent assigned facility when the 12-month review is due, the review shall be completed within 30 days upon the inmate's return.

D.   Subsequent reviews shall be scheduled so that each inmate under the sentence of death is reviewed by the unit review panel for his/her progress and adjustment, or for level advancement consideration, if eligible. Inmates sentenced to death shall be reclassified at least annually in accordance with Policy #401.04. Reviews occur in accordance with the following schedule:

    1.   Level C and B within six months or as necessary or due to administrative or disciplinary reasons.

    2.   Level A within 12 months or as necessary or due to administrative or disciplinary reasons.

E.   Inmates shall be provided the opportunity to be present during their hearings before the unit review panel. Inmates who refuse to appear before the unit review panel are subject to reduction of level assignment.

F.   Conviction of any disciplinary infraction will automatically result in a review by the unit review panel and possible reassignment to an appropriate program level.

G.   On a weekly basis, the Unit Adjustment Form, CR-3343, shall be completed by a unit team member. This form provides documentation of observed inmate behavior, staff perceptions of the inmate's adjustment to unit activities, and a description of the inmate's interaction with staff and other inmates.

H.  On a weekly basis, the Cell Inspection Form, CR-3115, shall be completed by a unit team member. This form includes a checklist of observable items which shall be inspected for cleanliness, damage, obstructions, neatness and contraband.

I.  The unit review panel, when reviewing an inmate for program level assessment, shall review all completed CR-3343 forms and CR-3115 forms completed during the time frame of the review. In addition, the following items shall be considered by the panel when recommending a level change:

1.  Inmate's disciplinary record.

2.  Past criminal record.

3.  Past record of incarceration(s).

4.  Criminal activity in prison or jail.

5.  Record of violent reactions to stressful situations.

6.  Institutional record on work/education assignment.

7.  Adjustment to unit activities.

8.  Willingness and ability to live harmoniously among others.

9.  Incompatibility with other inmates.

10.  Attitude toward authority.

11.  Personal hygiene.

12.  Involvement in STG activities.

13.  Psychological, psychiatric, and/or other behavioral health or medical evaluations completed within the past six months as provided by the institutional medical staff.

14.  Other information or special consideration that may reflect on the appropriateness of the level placement.

J.  Program level assignments recommended by the unit review panel are subject to the approval of the unit manager and Associate Warden of Security.

1.  Actions shall be documented on the unit review panel Hearing Sheet, CR-2937.

2.  The specific reasons for unit level review decisions must be stated and shall include consideration of behavioral health concerns identified in the course of evaluation pursuant to paragraph I.13 foregoing.

3.  Any level change from Level C requires the approval of the Warden. Inmates may appeal final decisions using Classification Appeal, CR-3004.

K.  Inmates shall be assigned to program levels as follows:

1.  Level C: All newly death sentenced inmates received at an institution shall be placed in Level C. An inmate shall remain at this level for a total of 12 months prior to receiving consideration for Level B. Available programming activities:

a.  Individual exercise – two hours per day.

b.  Individual religious counseling.

c.  All C level inmates will receive a visit from the mental health team at least once every 30 days and will be given the opportunity to participate in a private out-of-cell meeting with mental health staff.

d.  Individual education.

e.  Legal help from inmate legal assistants, on a non-contact visit basis, not to exceed a total of two hours each week as scheduled by the unit manager/designee.

f.  Non-contact visitation twice a week for no more than one hour per visit. After 12 months at Level C, a contact visit may be granted by the Associate Warden of Security based upon a favorable review of Section VI. (I)(5,6,7,8,10, and 11).

g.  Limited to one package every six months.

h.  Restraints shall be mandatory for all inmates classified to this level.

i.  May participate in in-cell arts and crafts on an individual basis, at the discretion of the Warden, according to demonstration of appropriate behavior.

2.  Level B: An inmate must remain at this level for 9 months, disciplinary-free, prior to receiving consideration for Level A placement pending review in accordance with Section VI.(F). Available programming activities:

a.  Participate in groups of six or less in the following:

(1)  Education.

(2)  Exercise – a minimum of two hours per day.

(3)  Religious services/activities.

(4)  Individual group counseling.

(5)  Legal help from inmate legal assistants, on a non-contact visit basis, not to exceed a total of two hours each week as scheduled by the unit manager/designee.

b.  Contact or non-contact visits, at the discretion of the Associate Warden of Security – twice a week for a total of three hours maximum.

c.  Limited to one package every three months.

d.  Restraints shall be mandatory for all inmates classified to this level. Restraints may be removed while an inmate is in a conference area or treatment area at the discretion of the unit manager. Wardens shall develop policies and procedures setting forth restraint procedures when inmates are out of their cells.

3.  Level A: Inmates at this level must maintain an overall exceptional rating in the unit and remain free from disciplinary convictions, pending review in accordance with Section VI (D). Available programming activities:

a.  Participation in the following activities in groups (of other inmates under sentence of death) at the discretion of the unit manager:

(1)  Exercise – a minimum of two hours per day.

(2)  Education.

(3)  Arts and crafts, if available.

(4)  Religious services/activities.

(5)  Individual or group counseling.

(6)  Group dinners, if appropriate and approved by the unit manager.

(7)  Cards and certain boards games, if appropriate and approved by the unit manager.

(8)  Use of active/passive multipurpose rooms as designated by the unit manager.

(9)  Law clerk or legal advisor from the population shall visit in the non-contact visiting area not to exceed one hour per day as scheduled by the unit manager, Monday through Friday. Access to library shall be established in local policies and procedures.

(10)  Movement in and out of their cells within the unit and exercise yards without restraints.

c.  Contact visits – twice a week for a total of three hours or more, depending on space availability, as approved by the Associate Warden of Security.

d.  Limited to one package every three months.

L.  If an inmate on any level elects not to participate in recreation or group programming for a period of thirty days or more, the unit manager shall notify the Behavioral Health Administrator.

a.  The Behavioral Health Administrator shall upon receipt of such notice arrange for a Qualified Mental Health Professional (QMHP) to conduct an assessment of the inmate's mental health condition.

b.  Upon completion of the assessment, the QMHP shall recommend to the Behavioral Health Administrator and make any recommendation for an immediate clinical intervention. The QMHP shall in all events document the findings and recommendations from the assessment, on the problem-oriented, CR-1884.

M.  Regardless of the disciplinary sanction imposed on an offender by reason of conviction for a disciplinary infraction, an offender on death row may be demoted one level or two levels. When an offender receives a demotion, they will not be eligible for a level increase for a period of between 3 and 12 months depending on the severity of the infraction, as determined by the following matrix:

| Offender level | Disc. Class | New Level | Consideration |
| --- | --- | --- | --- |
| A | A | C | 12 months |
| A | B | B | 6 months |
| A | C | B | 3 months |
| | | | |
| B | A | C | 12 months |
| B | B | C | 6 months |
| B | C | C | 3 months |
| | | | |
| C | A | C | 12 months |
| C | B | C | 6 months |
| C | C | C | 3 months |

N.  Program assignments to Level A or B and the housing assignments of inmates under sentence of death who is permanently assigned to a facility other than RMSI or DJRC shall be approved of disapproved by the Assistant Commissioner of Prisons/designee. The Assistant Commissioner of Prisons/designee shall consider all relevant circumstances including, but not limited to, the following:

1.  The safety of the inmate.

2.  The safety of other inmates.

    3.    The security of the institution.

O.    Any exceptions to this policy require the prior approval of the Commissioner.

P.    The Warden of any facility permanently housing inmates under the sentence of death shall develop local policies and procedures to administer this policy. These policies require the prior approval of the Assistant Commissioner of Prisons.

Q.    News Media - contact with news media shall be in accordance with Policy #103.04.

R.    Inmates in all levels shall be in full restraints when he/she leaves the building for medical, court, etc. Inmates assigned to DeBerry Special Needs Facility for medical/behavioral health reasons will be treated as a Level C inmate.

VII.    ACA STANDARDS: N/A

VIII.    EXPIRATION DATE: February 1, 2025







**DESCRIPTION:**
ON APRIL 27, 2324. AT APPROXIMATELY 13:43 AM CORPORAL PAMELA SWEENEY WAS MAKING A SECURITY CHECK IN UNIT 2 ALPHA POD WHEN INMATE HALL, JOHN 00238941 ASKED TO BE LET OUT OF HIS CELL SO THAT HE COULD GO TO BUILDING 2A. CORPORAL SWEENEY STATED TO INMATE HALL THAT HE MISSED THE CALL OUT AND WOULD HAVE TO WAIT FOR THE NEXT ONE. INMATE HALL BECAME UPSET AND STARTED TO THREATEN CORPORAL SWEENEY EVERY TIME SHE MADE A SECURITY CHECK IN THE POD BY STATING YOU BETTER HAVE A GOOD ATTORNEY BECAUSE YOU CAN NOT DO THIS. INMATE HALL IS CHARGED WITH THREATENING STAFF. APPROVED AND REVIEWED BY LIEUTENANT SAMUEL BEAVER.

PREPARED BY STAFF ID:  BEAV8A34  BEAVER, SAMUEL
REPORTED BY STAFF JQ:  BEAV8A34  BEAVER, SAMUEL

I HAVE BEEN GIVEN A COPY OF THIS REPORT AND HAVE BEEN TOLD ABOUT MY LIMITED RIGHT TO REMAIN SILENT AND TO BE REPRESENTED BY AN OFFENDER ADVISOR.

_____     4/28/24  01:15
OFFENDER SIGNATURE                DATE/TIME
HALL, JOHN                        00238941

OFFENDER WAS GIVEN COPY OF REPORT AND ADVISED OF RIGHTS BUT REFUSED TO SIGN REPORT.

P. ADaum opy                      4 28 24 01:15
EMPLOYEE INITIALS, IF REPORTING   DATE/TIME
EMPLOYEE; OTHERWISE, FULL NAME.

_See attached 3 Pages_
1) _Jon Hall's 4/27/24 encounter_
   _with Cpl. Sweeney_
2) _Psycho Profile of_
   _Cpl. Sweeney_
   _Joe — 1:15 AM_

---

Beav8a04                          4-27-2024  1627
REPORTING OFFICIAL                DATE/TIME

Beav5a04                          4-27-2024  1627
PREPARED BY                       DATE/TIME

_____     4-27-2024  1627
REVIEWING DISCIPLINARY SUPERVISOR  DATE/TIME

IF PLACED IN SEGREGATION:

_____     _____
SENIOR SECURITY OFFICER           DATE/TIME

_____     _____
WARDEN (SEGREGATION PENDING INVESTIGATION)  DATE/TIME

---

3.    **Formal Disciplinary Action:** When formal disciplinary action is required, the following procedures should be implemented:

The reporting employee shall initiate disciplinary action by documenting the incident on a draft form for the shift supervisor/department head to review. Once the draft report has been reviewed and approved, the incident that prompted the action shall be entered onto the offender management system (OMS) Incidents (LIBK). Staff entering the incident shall be trained in entering, editing, or correcting the incident for the appropriate charge. Once the incident has been successfully entered, OMS will generate an incident number that shall then be used to add the disciplinary report onto the disciplinary screen (LIBK). The report B101MGL may then be created by using F13 after disciplinary screen (LIBK) is completed and entered. A separate screen must be completed for each infraction for which the inmate is charged. An employee (not necessarily the reporting employee) shall read the report to the inmate and advise him/her of their rights. The employee shall sign, date, and time the report and request the inmate to sign acknowledging receipt of the report. If the inmate refuses to sign, the result shall be noted on the form. One copy shall be given to the inmate at this time and a copy should be provided to the inmate advisor or appropriate staff member. The original shall be forwarded to the disciplinary hearing officer for processing.

The Assistant Commissioner of Prisons/designee as authorized must approve any request for deletion or modifications to disciplinary screens (LIBJ), (LIBK), and (LIBL). All requests shall be submitted on Incident/Disciplinary Modification or Deletion Request, CR-3710.

F.    **Additional Procedures**

1.    When the inmate is reasonably passive and cooperative, and the charge is a Class C offense, (See Policy #502.05) The inmate shall be permitted to continue his/her normal duties pending the hearing (unless precluded by a cell change or other eligibility requirement).

2.    When the charge is a Class A or B offense. (See Policy #502.05)

       a.    When the inmate is reasonably passive and cooperative, the shift commander in operations shall assess the situation and make a decision as to whether the inmate may be allowed to continue his/her normal duties pending the hearing, to place the inmate in segregation, or to transfer the inmate to a more secure institution.

→     b.    If the decision is made that segregation is unnecessary, the inmate shall be permitted to continue his/her normal duties pending a hearing (unless precluded by a cell change or other eligibility requirement).

       c.    If the rule violation is alleged (not witnessed by a staff member), the shift commander shall initiate an investigation into the charge and supply the disciplinary board or hearing officer with information prior to the hearing.

3.    In order to ensure the safe, secure, and orderly operation of the institution, the shift supervisor shall segregate inmates who:

---

56.   **Refusal of Cell Assignment (RCA) (Class B or C):** Refusal to accept a cell assignment made by a TDOC employee.

57.   **Refusal of a Direct Order (RDO) (Class C):** The willful refusal to follow and carry out a specific, authorized, written or verbal directive.

58.   **Refusal of or Attempt to Alter Test (RAA) (Class A):** Refusal to provide an adequate breath or urine sample for a drug or alcohol screen upon request, refusal to sign any chain of custody forms, or attempting to change or modify documents, urine, or blood content for the purpose of creating false negative test results.

59.   **Refusal to Participate (RTP) (Class A):** Refusal by any inmate to accept or report to or adequately participate in any assigned work, educational, or vocational training programs.

60.   **Refusing to Provide DNA Specimen (RDN) (Class A):** Refusal by any inmate who has been convicted of a sex offense as outlined in T.C.A. 40-35-321, to provide a DNA specimen when ordered to do so.

61.   **Robbery (RAB) (Class A or B):** The forcible taking of money or goods of any value from another person.

62.   **Sexual Battery (SXB) (Class A):** Sexual contact by an offender with any staff member, contract employee, visitor, guest, or inmate and the inmate knows or has reason to know the victim did not consent.

63.   **Sexual Harassment (SXH) (Class B or C):** Making sexually related comments, gestures, or written communication to another person.

64.   **Sexual Misconduct (SXM) (Class B or C):** Any sexual conduct between inmates, including those instances where the preponderance of evidence is indicative of a preparation for, or immediate conclusion of such acts, including acts involving people, objects, or animals.

65.   **Solicitation of Staff (SOS) (Class B or C):** To ask or seek fraternization, business transactions, social association, or friendship with state or contract employees which extends beyond the normal in inmate/employee interaction.

66.   **Tampering with Security Device or Equipment (TSD) (Class A):** Tampering with locking or other security devices or equipment causing that device to malfunction or become inoperable.

67.   **Threatening Employee (TEM) (Class B or C):** A threat to an employee, whether verbal or physical, explicit, or implied that does not involve any physical contact.

68.   **Threatening Offender (TOF) (Class B or C):** Intimidation or coercion of unwilling inmates to participate in any act or a threat to an inmate, whether verbal or physical, explicit, or implied.

 _Jon Hall's Exhibit [J] 4 Pages_

---

# *Disciplinary*



Suspend ☐

TOMIS ID  00238941  Hall, John

Status ACTV  Location RMSI

Disciplinary     Sentence        Appeal

| | | | |
|---|---|---|---|
| Incident ID | 01623106 | Incident Date | 04/27/2024 |
| Site ID | RMSI  Riverbend Maximum Security Institution | | |
| Disclp Date | 04/27/2024 | Disclp Time | 04:16 PM |
| Class ID Number | | Section ID | |
| Position ID | | Disciplinary Class | |
| Refused to Sign Date | | Job Code | |
| Weapon Used | | Level of Violence | No Violence ⌄ |

Posted by Staff ID  BEAVSA04  Beaver, Samuel

Infraction Type  Threatening Employee

Offender Advisor
Staff Advisor
Offender Account  Dismissed Per Acting Warden Clendenin
Outburst From Inmate Deemed Non-threatening But An
Expression Of This Inmates Right

Decision ID  MOYERA01  Moyer, Raymond
MOYERA01  Moyer, Raymond
MOYERA01  Moyer, Raymond

Plea  N       Disposition  Dismissed       Disposition Date  05/06/2024

LIBK

☆ Jon Hall's Exhibit 8
1 Page



# TENNESSEE DEPARTMENT OF CORRECTION
## INMATE GRIEVANCE

NAME: Odom, Richard L.    NUMBER: #215639    INSTITUTION & UNIT: R.M.S.I / Unit-2 / A-206

DESCRIPTION OF PROBLEM: While Mr. Keys was the unit Manager of Unit-2. He assigned me to be the rock/man 2nd of 1st - pod. He also assigned me the Unit' Hazmat, job to. no. Also. For

REQUESTED SOLUTION: I oppose this. Put me back between $88. to $94 per month as I was before. And I will do all the jobs as before; 1. Rockman in C-pods; 2). Hazmat of Unit 2; 3). Cleaning the upper

Signature of Grievant: Richard L. Odom    Date: June 18th 2024

---

TO BE COMPLETED BY GRIEVANCE CLERK

| Grievance Number | Date Received | Signature Of Grievance Clerk |

INMATE GRIEVANCE COMMITTEE'S RESPONSE DUE DATE: _____

AUTHORIZED EXTENSION: _____
New Due Date _____ Signature of Grievant

### INMATE GRIEVANCE RESPONSE

Summary of Supervisor's Response/Evidence:

Chairperson's Response and Reason(s):

DATE: _____ CHAIRPERSON: _____

Do you wish to appeal this response? _____ YES _____ NO
If yes: Sign, date, and return to chairman for processing within five (5) days of receipt of first-level response.

| GRIEVANT | WITNESS |

Distribution Upon Final Resolution:
White - Inmate Grievant    Canary - Warden    Pink - Grievance Committee    Goldenrod - Commissioner (if applicable)
CR-1394 (Rev. 3-00)    Page 1 of 2    RDA 2244

*Jon Hall's Exhibit [9]*
*4 Pages*

---

## RIVERBEND MAXIMUM SECURITY INSTITUTION
7475 Cockrill Bend Blvd
Nashville, TN 37209-1048

TO: All Staff
FROM: Unit Manager Unit 2
DATE: 11-23-2021
RE: Cleaning the upper sections of dayrooms in front of UC 2

TO: All Staff Members,

Inmate Richard Odom # 215639 has been approved to clean the upper parts in front of the control room in all pods at leas once a month in all pods or as needed.

*Attached 1*

UNIT MANAGER OF UNIT TWO (Dav)

---

### TENNESSEE DEPARTMENT OF CORRECTION
### INMATE GRIEVANCE    (continuation sheet)

DESCRIPTION OF PROBLEM: the pods, in. Unit 2.

While Mr. Davis was the unit Manager of Unit-2. He & the upper parts in front of the Unit control room in all pods me to do it just once a month. As part of my job as a (see attached).

Some time last year. The unit supplies was sent into C-pod to put up. Adding yet another job. I am now doing 4 jobs. jobs than any other inmate here in Unit 2.

I was making something like between $88 to $94 (see attached) per month. But now I'm only making $60 per month or less attached 2).

After it put $50.00 a month on my phone account so I can call family in Mississippi. I will only have $10 left to buy soap, cal, etc. which $10 dollars won't pay for for a whole month. P... won't be able to buy an incentive made, as other inmate will the privilege to do.

Out of the 4 jobs I am doing. I only get paid for doing th rock/man job nothing else. To put more and more jobs on me not compensating me for the work I do, is wrong and should illegal in State and federal laws.

Requested Solution: parts in front of the control rooms in pods; 4). Storeing Unit-2 supplies in C-pod/or 5). pay me for the jobs I was doi jobs without pay.

Distribution Upon Final Resolution:
White - Inmate Grievant    Canary - Warden    Pink - Grievance Committee    Goldenrod - Commissioner (if applicable)
CR-1394 (Rev. 3-00)    Page 2 of 2    RD.

---

**Trust Fund**

Menu    Favorites    Tools    Other Applications    Reports    Help    PR

Links    Odom, Richard

Inmate:    Current Balance    242.97
Pending Balance

| Trans Date | Seq No | Trans Type | Transaction Code | Transaction Amount | Trans Site | Current Balance | Pend A |
|---|---|---|---|---|---|---|---|
| 06/13/2024 | 3 | 0 | COO | 6.31 | RMSI | 242.97 | |
| 06/13/2024 | 2 | 0 | COM | 124.47 | RMSI | 237.66 | |
| 06/13/2024 | 1 | 0 | PAD | 60.00 | RMSI | 242.13 | |
| 06/06/2024 | 1 | 0 | COM | 27.95 | RMSI | 302.13 | |
| 05/23/2024 | 2 | 0 | COO | 12.03 | RMSI | 330.09 | |
| 05/23/2024 | 1 | 0 | PAD | 71.88 | RMSI | 318.06 | |
| 05/13/2024 | 3 | 0 | COO | 5.06 | RMSI | 389.94 | |
| 05/13/2024 | 2 | 0 | INO | 28.41 | RMSI | 348.88 | |
| 05/13/2024 | 1 | 0 | COM | 413.70 | RMSI | 417.29 | |
| 05/13/2024 | 1 | 0 | PAD | 93.00 | RMSI | 830.99 | |

June *
May *

*Attached 2*

Top Of List

# Trust Fund



Links   Suspend

Account   00238941   Hall, John   Status   ACTV   Location   RMSI

Reset key fields   Transactions   Obligations   Organizations

Actual Site   RMSI   Assigned Site   RMSI   Current Balance   366.91

Refresh   Pending Balance

JUNE
A Rock-Man Pay *

| Trans Date | Seq No | Trans Type | Transaction Code | Transaction Amount | Trans Site | Current Amount | Pend Amount |
|---|---|---|---|---|---|---|---|
| 06/13/2024 | 3 | C | COC | 13.96 | RMSI | 366.91 | |
| 06/13/2024 | 2 | D | COM | 114.23 | RMSI | 352.95 | |
| 06/13/2024 | 1 | C | PAD | 57.12 | RMSI | 467.18 | |
| 06/06/2024 | 2 | C | COC | 24.34 | RMSI | 410.06 | |
| 06/06/2024 | 1 | D | COM | 61.98 | RMSI | 385.72 | |
| 05/23/2024 | 2 | C | COC | 5.10 | RMSI | 447.70 | |
| 05/23/2024 | 1 | D | COM | 73.54 | RMSI | 442.60 | |
| 05/16/2024 | 3 | C | COC | 22.91 | RMSI | 516.14 | |
| 05/16/2024 | 2 | D | INC | 26.22 | RMSI | 493.23 | |
| 05/16/2024 | 1 | D | COM | 73.75 | RMSI | 519.45 | |

Search

Menu   Favorites   Tools   Other Applications   Reports   Help   PROD (LTFE)

## Trust Fund

Links   Suspend

Account   00238941   Hall, John   Status   ACTV   Location   RMSI

Reset key fields   Transactions   Obligations   Organizations

Actual Site   RMSI   Assigned Site   RMSI   Current Balance   516.14

Refresh   Pending Balance

Enter
A Rock-Man Pay *

| Trans Date | Seq No | Trans Type | Transaction Code | Transaction Amount | Trans Site | Current Amount | Pend Amount |
|---|---|---|---|---|---|---|---|
| 05/16/2024 | 3 | C | COC | 22.91 | RMSI | 516.14 | |
| 05/16/2024 | 2 | D | INC | 26.22 | RMSI | 493.23 | |
| 05/16/2024 | 1 | D | COM | 73.75 | RMSI | 519.45 | |
| 05/14/2024 | 1 | C | PAD | 92.00 | RMSI | 593.20 | |
| 05/09/2024 | 2 | C | COC | 15.30 | RMSI | 501.20 | |
| 05/09/2024 | 1 | D | COM | 81.54 | RMSI | 485.90 | |
| 05/02/2024 | 3 | C | COC | 8.35 | RMSI | 567.44 | |
| 05/02/2024 | 2 | C | VIC | 150.00 | RMSI | 559.09 | |
| 05/02/2024 | 1 | D | COM | 82.90 | RMSI | 409.09 | |
| 05/01/2024 | 1 | C | VMB | 50.00 | RMSI | 491.99 | |

Search

Jon Hall's Exhibit [6]



IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

| | | |
|---|---|---|
| JON DOUGLAS HALL, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 05-1199 |
| vs. | ) | |
| | ) | **ORAL ARGUMENT REQUESTED** |
| RICKY BELL, Warden, Riverbend | ) | |
| Maximum Security Institution, | ) | |
| | ) | |
| Respondent. | ) | |

RESPONSE TO
RESPONDENT'S MOTION FOR JUDGMENT ON THE PLEADINGS

## I.    INTRODUCTION

A Madison County jury convicted Jon Hall of the first-degree murder of his wife Billie Jo Hall and thereafter sentenced him to death. The only issue in Hall's case was whether he acted with "cool purpose" (deliberation) and premeditation, essential *mens rea* elements of first-degree murder.  Then, as now, it was apparent as a matter of law and fact that Hall did not kill Billie Jo deliberately, but in an intoxicated, emotionally-charged state. Despite this, given numerous constitutional errors, Hall's jury never fairly evaluated his *mens rea*, and thus unconstitutionally convicted him and sentenced him to death in what can only be called a domestic relations tragedy.

1

a. There Is No Question That Jon Hall Suffers Severe Brain Damage, And As Dr. J. Douglas Bremner, M.D. Concludes, Hall Did Not Kill Deliberately (With Cool Purpose) Given His Brain Damage And Intoxication At The Time Of The Killing

We know from Magnetic Resonance Imaging (MRI) and Positron Emission Tomography (PET) scans of Hall's brain that he suffers significant brain damage which directly affected his ability to deliberate and premeditate.

As world-renowned University of Pennsylvania neuropsychologist Dr. Ruben Gur, Ph.D., explains, Jon Hall has an "unusual brain structure"[41] and suffers from acute brain damage within his frontal lobe and limbic system, which compromises his ability to deliberate, reflect upon his actions, and control his emotions and conduct. Hall has "*abnormalities* in frontal, limbic and associated regions relevant to behavior, especially *related to the interpretation of emotionally relevant information and regulation of response.*"[42]

Hall's MRI Scan (which shows structural damage) shows that Hall's frontal lobe is highly abnormal bilaterally. Hall's right frontal lobe is severely damaged, with the volume of that lobe being extremely abnormal at 3 standard deviations (SDs) below that of a normal brain.[43] The left frontal lobe also shows significant damage, its volume being 2 SDs smaller

---

[41] Ex. 35: Report of Dr. Ruben Gur. Ph.D., p. 1.

[42] Id. at 3-4. (Emphasis added).

[43] Id. at 2.

-75-

than that of a normal brain.[44] Within the right frontal lobe, the right inferior frontal lobe is

likewise 2 SDs below normal, with the right medial gray matter nearly 2SDs below normal

as well.[45] In addition, "Ventricular volume is abnormally high bilaterally (nearly 3SDs above

normal), which indicates loss of tissue in medial structures. This is consistent with head

injury, but is also found with high prevalence in neurodevelopmental disorders such as

schizophrenia."[46]

In other words, brain damage permeates Hall's frontal lobe, with the damage being

most pronounced on the right side. The substantial abnormalities in this region of Hall's

brain are significant, because the frontal lobe governs the ability to control one's behavior,[47]

and the proven damage to those regions means that, as a purely neurological and biological

matter, Hall lacks the same ability as a normal, non-brain-damaged person to control his

behavior.

Hall's brain is severely damaged in other areas as well, as shown by Hall's Positron

---

[44] Id.

[45] Id.

[46] Id.

[47] Id. at 2 ("reduced volume in inferior frontal cortex suggests *impaired ability to control emotions and adjust response*") (emphasis added); Ex. 36: Report of J. Douglas Bremner, M.D., nn. 94-100 & text (neural circuitry of Hall that is involved in control of emotions includes medial prefrontal cortex, *adversely affecting "ability to control emotions"*) (emphasis added).

Emission Tomography (PET) Scan, which reveals significant functional abnormalities within the brain.[48] As Dr. Gur notes, there is abnormal, reduced glucose metabolism in 22 of 36 regions of Hall's brain.[49] There is significant damage within the hippocampus and amygdala,[50] regions of the brain within the limbic system, which controls and regulates emotion. As Dr. Gur explains: "[T]he amygdala, which is at the epicenter of the emotion processing circuitry, shows both volume reduction and abnormal symmetry."[51] Further, Hall has damage to the insular cortex (which is also involved in processing emotional experiences) as well as the corpus callosum, the neural pathway which connects and integrates the left and right hemispheres of the brain.[52]

All of this brain damage limits Hall's ability to control his behavior, especially in an emotionally charged situation. "The combined effect of damage to the amygdala, insular cortex and inferior frontal regions would substantially impair the ability to interpret emotionally relevant information and inhibit impulsive behavior."[53] As Dr. Gur explains, the effect of Hall's brain damage upon his behavior is significant:

---

[48] Ex. 36 (PET Images).

[49] Ex. 35: Gur Report at 3.

[50] Id. at 3 & Figure 3.

[51] Id.

[52] Id.

[53] Id.

-77-

These abnormalities indicate disturbed activity in regions that are important in regulation of emotions and behavioral control. Thus, the abnormal activity of frontal regions would disrupt executive functions and the ability to make behavior adjust to context. Disturbed amygdala and other limbic activity would impair the ability to interpret emotionally relevant information. Reduced corpus callosum activity would diminish the ability to integrate behavior interhemispherically, and abnormal basal ganglia activity would disrupt guidance of movements directly controlled by the frontal motor areas.[54]

This damage impairs Hall's "ability to modulate his emotional behavior in response to situational demands,"[55] and means that his ability to control his impulses is impaired:

This analysis indicates structural damage in regions with significant relevance to behavior, especially related to the regulation of emotions. The reduced volume in inferior frontal cortex suggests impaired ability to control emotions and adjust response to the context. Medial gray matter is involved in memory, the perception of threat and the response to it. The combined effect of damage to medial gray matter and inferior frontal regions would substantially impair the ability to interpret emotionally relevant behavior and inhibit impulsive behavior.[56]

Given Hall's brain damage, along with the fact that he was intoxicated the night of the killing, Dr. J. Douglas Bremner, M.D., Professor of Psychiatry and Director of the Clinical Neuroscience Research at Emory University Medical School, concludes that when Hall killed

---

[54] Id.

[55] Id. at 4.

[56] Id. at 2.

-78-

Billie, he did not act with "deliberation" required by Tennessee law.[57] Dr. Bremner bases his conclusion on the fact that Hall suffered abuse and neglect as a child, he suffers brain damage in regions affecting his ability to deliberate, premeditate, and control his emotions, and he was also intoxicated at the time. Hall simply "did not act in a deliberate, coolly planned, and intentional way, or after planning and reflection, in order to kill his wife."[58]

As Dr. Bremner explains, it quite clearly appears that Jon Hall suffered traumatic stress as a child from parental abuse and neglect. That abuse and neglect ranged from witnessing his father's horrific physical abuse of his mother, suffering physical and emotional trauma from his father, being neglected by his mother, all of which was exacerbated by Hall's living in poverty (see Section V.B.3, *infra.* ).[59]

Such traumatic stress affects the brain biochemically, through the release of stress hormones and neurotransmitters which, in turn, affects and alters brain function. Via such mechanisms, such stress causes "alteration in memory function," which "affect[s] the ability of the traumatized person . . . to think in a deliberate and logical fashion."[60] It also causes

---

[57] Ex. 37: Bremner Report.

[58] Id. at 9.

[59] Id. at 3-4.

[60] Id. at 6, 7.

-79-

perceptible "changes in a circuit of brain areas, including hippocampus,[61] amygdala, and medial prefrontal cortex."[62] This is significant, because the prefrontal cortex, hippocampus, and amygdala are all "brain areas that play a critical role in the regulation of thinking, control of emotion, and that determine the ability of individuals to act in a cool, rationale and deliberate fashion."[63] Since "the hippocampus is involved in the control of emotion, . . . damage to this area will result in an inability to control emotions and act in a logical and deliberate way."[64]

As Dr. Bremner explains, the hippocampus, amygdala, and frontal lobes are the very brain regions which have been "specifically shown to be abnormal in Jon Hall."[65] Given Hall's brain damage, Dr. Bremner makes clear that when Billie Hall was killed, Jon Hall was severely compromised (neurologically and biochemically) in his ability to control his emotions and behavior:

> [T]raumatic stress has lasting effects on brain regions including the hippocampus, amygdala and medial prefrontal cortex, as well as

---

[61] Thus, for example, veterans of the Viet Nam war display neurological damage in the hippocampus as a result of their exposure to wartime violence. Id. at 7.

[62] Id. at 6. See also Id. at 5 ("brain regions that play an important role in trauma related mental disorders include hippocampus, amygdala, and medial prefrontal cortex.")

[63] Id. at 9.

[64] Id. at 7.

[65] Id. at 8.

-80-

neurochemical systems including cortisol and norepinephrine. These changes also result in changes in behavior, so that a traumatized person . . . will not have the same ability to control behaviors, emotions or thinking as a normal person would. Based on this, Jon Hall, with his history of early abuse and neglect, and the documented alterations in his brain, would be less likely than normal persons to act in a deliberate fashion, with a cool purpose, or to exercise normal reflection and judgment.[66]

Given "the documented alterations in [Hall's] brain, [Hall] would be less likely than normal persons to act in a deliberate fashion, with a cool purpose, or to exercise normal reflection and judgment."[67]

And while Hall's documented brain damage made deliberation and premeditation less likely, what made Hall unable to act in a cool and deliberate fashion was the combination of that brain damage with Hall's use of alcohol, discussed *supra* in Section III. The synergistic effect of alcohol and brain damage meant that Hall did not act with "cool purpose" when he attacked Billie Hall when the argument erupted.

The fact that he had been drinking was an additional factor, added on to his abnormal brain function, that would contribute to his inability to properly regulate emotion, as well as to think properly and act in a logical and deliberate manner."[68]

―――――――――――――――――――――

[66] Id. at 6.

[67] Id. at 9.

[68] Id. at 4. Compare Pirtle v. State, 1849 WL 2087, *3 (Tenn. 1849) (affirming second degree murder conviction: "If the mental status required by law to constitute crime be one of deliberation and premeditation, and drunkenness or other cause excludes the existence

(continued...)

-81-

A damaged brain is bad enough, but a damaged brain subjected to alcohol is much worse. Whereas Hall's ability to act with "cool purpose" and control his behavior was severely compromised because of brain damage, it was even further limited by the damaging effects of alcohol. It is no wonder that being brain-damaged and intoxicated, Hall did not act deliberately just as Dr. Bremner has concluded. To reiterate, Dr. Bremner makes clear that:

> **[Hall] did not act in a deliberate, coolly planned, and intentional way, or after planning and reflection, in order to kill his wife.**[69]

That means that Jon Hall is not guilty of first-degree murder, but only of the lesser offense of second-degree murder.

> **b.    Counsel Was Ineffective For Failing To Investigate And Present Evidence Of Hall's Brain Damage And Mental Health At The Time Of The Killing**

Of course, it was for the jury to decide whether, beyond a reasonable doubt, Hall acted with deliberation, premeditation, and intent. Yet in making that determination, the jurors were not provided this critical evidence which shows, without question, that Hall is brain damaged, that such damage is localized in regions governing emotion and control. The jurors

---

[68](...continued) of such mental state, the crime . . . has not in fact been committed"); id. at 4 (in distinguishing between the intent necessary for first- as opposed to second-degree murder, *"all the concomitant circumstances shall be heard"* including whether the perpetrator had been drinking) (emphasis added).

[69] Id. at 9. (Emphasis added)

also were not provided any psychiatric proof (such as that provided by Dr. Bremner) establishing that Hall did not act with deliberation, given his intoxication and brain damage. Where Hall's *mens rea* was the entire focus of the trial, counsel's failure to provide the jury such evidence of brain damage and mental disturbance constituted ineffective assistance of counsel.

### 1)    Counsel's Performance Was Deficient

Counsel's performance was deficient. Because the entire focus of Hall's trial was his *mens rea*, counsel had no reason not to present evidence of Hall's brain damage and resulting mental health problems in support of the *mens rea* defense. Indeed, such evidence of brain damage fits hand-in-glove with the evidence of intoxication which was already presented (and stressed) by counsel to the jury. This additional evidence would have complemented the evidence already presented by counsel, and it would have immeasurably strengthened the defense case for reasonable doubt concerning the elements of first-degree murder. Given these circumstances, counsel's failure to present such evidence was not, and could not have been, "tactical," but was mere oversight. Indeed, when counsel chooses a particular defense (as counsel did here with the *mens rea* defense), counsel must effectively investigate that defense before presenting it to the jury. See Mauldin v. Wainwright, 723 F.3d 799 (11th Cir. 1984)(counsel was ineffective for failing to investigate chosen defense). Thus, counsel's performance here was deficient.

-83-

when, in fact, it found only one. <u>Compare</u> T.R. 220 (reporting that jury found two aggravating circumstances: (1) the murder was heinous, atrocious, and cruel; and (2) murder committed to avoid arrest) <u>with</u> T.R. Supplemental Record On Appeal, Jury Verdict Form (demonstrating that the jury found the former circumstance but not the latter). In addition, the trial judge failed to provide in the Rule 12 Report important information on Mr. Hall's life - specifically his education level and his work history. (T.R. 222).

On direct appeal, Tennessee's appellate courts conducted the statutorily mandated proportionality review with the inaccurate and incomplete Rule 12 Report. <u>See</u> <u>State v. Hall</u>, 8 S.W.3d 593, 604-06 (Tenn. 1999); <u>State v. Hall</u>, 1998 WL 208051 at *16 (Tenn.Crim.App. 1998).

By failing to create the mandatory accurate and complete Rule 12 Report, and by performing proportionality review with an inaccurate and incomplete form, Tennessee courts deprived Mr. Hall of his property right to have them conduct such review with an accurate and complete Rule 12 Report. As a result, Mr. Ha;;s death sentence in unconstitutional.

F.   Mr. Hall Agrees That His Claim Respecting His Incompetence For Execution (Claim 17) Is Not Currently Ripe For This Court's Consideration

Mr. Hall agrees with the State's position that, at the present time, Mr. Hall's claim that he will be incompetent to be executed is not ripe for this Court's consideration. ®. 90-2

-157-

at 44-45).  Mr. Hall included that claim in his habeas petition to ensure that if he becomes

incompetent as his execution approaches, his ability to challenge his competence for

execution will not be compromised.  See Panetti v. Quarterman, 551 U.S. 930, ___-___, 127

S.Ct. 2842, 2852-55 (2007); Stewart v. Martinez-Villareal, 523 U.S. 637, 643-44 (1998).

VIII.   CONCLUSION

> For the foregoing reasons, this Court should deny the State's Motion For Judgment

On The Pleadings.

> Pursuant to LR7.2( c), the petitioner requests oral argument on this dispositive

motion, which raises complex issues of fact, law and procedure.

> > Respectfully submitted,
>
> > Paul R. Bottei, Tenn.B.P.R. #017036
> > Michael J. Passino, Tenn.B.P.R. # 05725
> > Assistant Federal Public Defenders
>
> > Office of the Federal Public Defenders
> > Middle District of Tennessee
> > 810 Broadway, Suite 200
> > Nashville, Tennessee 37203
> > (615) 736-5047
>
> > /s/ Michael J. Passino

-158-

## CERTIFICATE OF SERVICE

A copy of this motion will be served on counsel for respondent electronically by the
CM/ECF system.

/s/ *Michael J. Passino*

-159-